Dr. Dilip K. CHAUDHURI, Plaintiff,

v.

STATE OF TENNESSEE, et al., Defendants.

No. 3–91–0081.

United States District Court, M.D. Tennessee, Nashville Division.

Jan. 6, 1995.

Joseph Howell Johnston, Nashville, TN, for Dilip K. Chaudhuri.

James Andrew Hoyal, II, Leslie Ann Bridges, Office of Atty. Gen., Nashville, TN, for State of Tenn., Tennessee State University, Annie Neal, George Cox, Decatur Rogers, Chinyere Onwubiko.

Leslie Ann Bridges, Office of Atty. Gen., Nashville, TN, for James A. Hefner, Arthur C. Washington.

## MEMORANDUM

ECHOLS, District Judge.

Presently pending before this Court is Defendants' Motion for Summary Judgment, to which Plaintiff has filed a Memorandum in Opposition. For the reasons more fully discussed herein, Defendant's Motion for Summary Judgment is hereby GRANTED IN PART and DENIED IN PART. Accordingly, this case will proceed to trial as scheduled to try Plaintiff's claim of employment discrimination regarding the denial of his promotion to Head of the Department of Mechanical Engineering.

Plaintiff, Dr. Dilip K. Chaudhuri, brought this suit against Defendants, State of Tennessee, Tennessee State University ("TSU"), and four TSU professors and administrators—Dr. Annie Neal ("Neal"), Dr. George Cox ("Cox"), Dr. Decatur Rogers ("Rogers"), and Dr. Chinyere Onwubiko ("Onwubiko"). Plaintiff has brought two causes of action. First, Plaintiff, who at all times relevant to this suit was a tenured, full professor at TSU,[1] brought an action for employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1988), arguing that Defendants refused to promote him based on his race and/or religious beliefs. Plaintiff is an Asian originally from the Republic of India, and he follows the Hindu religion. Second, Plaintiff claims that Defendants deprived him of his civil rights in violation of 42 U.S.C. § 1983. Plaintiff argues that Defendants violated his rights under both the Establishment Clause and the Free Exercise Clause of the First Amendment by approving the practice of offering Christian prayers at university functions that he is required to attend. Plaintiff now seeks monetary, declaratory, and injunctive relief for these alleged violations.

By an Order entered July 24, 1991 (Docket Entry No. 30), Judge Wiseman dismissed Plaintiff's 42 U.S.C. § 1983 claim in its entirety against Defendants State of Tennessee and TSU. Plaintiff later amended his com-

---

1. TSU is an historically black university. The majority of its student and faculty population is black. In fact, black employees at TSU have been declared not to be members of a protected class for purposes of Title VII, and the school is currently subject to a court-ordered desegregation plan. (See Complaint, Docket Entry No. 1, ¶ 26; Amended Complaint, Docket Entry No. 27, ¶ 13; Answer, Docket Entry No. 33, ¶ 13).

plaint to add two TSU administrators, Dr. James A. Hefner ("Hefner") and Dr. Arthur C. Washington ("Washington"), as Defendants in this action (Docket Entry No. 52).[2]

Plaintiff's employment discrimination claim is based on the denial of his applications for promotion to either Dean of the School of Engineering at TSU or Head of the Mechanical Engineering Department at TSU. In the fall of 1987, the position of Dean of the School of Engineering became available and a search committee was appointed to recommend a new dean. Plaintiff applied for the position in September 1987. Soon after applying for the position, Plaintiff filed a complaint with the Tennessee Board of Claims objecting to the offering of Christian prayers at university functions he was required to attend. As a result of Plaintiff's complaints, the Tennessee Board of Regents issued a memorandum on May 9, 1988 to all member colleges and universities, including TSU. This memorandum stated that the Establishment Clause prohibited the offering of sectarian prayers at state university-sponsored functions.

The selection committee considered Plaintiff and eight other applicants for the position of Dean of the School of Engineering. The committee ranked each applicant in nine different areas. After ranking each applicant, the committee submitted the names of the three highest ranking applicants to Defendant Neal. Defendants contend that Plaintiff was not among the three highest ranking applicants.[3] Defendants claim that Defendant Rogers, who is black, was the highest ranking applicant and received the recommendation of the committee. Defendant Neal then recommended Defendant Rogers to the President of TSU, Dr. Otis Floyd, who made the decision to extend an offer to Defendant Rogers and forwarded the recommendation to the Tennessee Board of Regents, which accepted the recommendation.

After Defendant Rogers assumed his position as Dean of the School of Engineering in 1988, a search began for a new Head of the Mechanical Engineering Department. Plaintiff, who was on leave to work in Boulder, Colorado, applied for that position as well. Applicants for the position submitted their applications to Defendant Rogers, who passed those applications on to the selection committee chaired by Dr. Satinderpaul Devgan. On June 26, 1989, Plaintiff wrote a letter to Defendant Rogers, requesting that he use the bio-data from his personnel file and all other necessary information for purposes of his application. Rather than include all of the bio-data from Plaintiff's personnel file, Defendant Rogers gave to the selection committee only Plaintiff's faculty profile on file with the university for accreditation purposes.

Before the selection committee made its final screening report, Dr. Benjamin Okeke, another applicant, was flown to Nashville to interview for the position on June 20, 1989. At the time, Dr. Okeke, who is black, was ranked first by the selection committee. Once the selection committee received Plaintiff's application materials from Defendant Rogers, the committee made a final ranking determination. According to a 100–point system assessing various criteria, the committee gave Dr. Okeke the highest ranking, Plaintiff received the second highest ranking, and Defendant Onwubiko received the third highest ranking. Thus, Dr. Okeke received the recommendation of the committee. The committee forwarded this recommendation to Defendant Neal, who, in turn, forwarded it to the Tennessee Board of Regents.

After learning of the university's recommendation to offer the position to Dr. Okeke, Plaintiff filed an objection with the Tennessee Board of Regents, claiming that he was more qualified for the position and that his application was not given appropriate consideration. As a result of this objection, the recommendation was withdrawn.

---

2. Defendant Cox was not included as a defendant in Plaintiff's Second Amended and Supplemental Complaint as a Suggestion of Death was filed with the Court on Defendant Cox's behalf. (Suggestion of Death Upon the Record Under Rule 25(a)(1), Docket Entry No. 36).

3. Unfortunately, virtually all of the records regarding the selection of the Dean of the School of Engineering in 1988 cannot be found. Plaintiff contends that the very fact that these documents have been "lost" renders Defendants' promotion decision suspect.

The following year, Defendant Rogers began a new search for the Head of the Mechanical Engineering Department. He appointed Dr. Mohan Malkani to chair a new selection committee. Of the six members on the new committee, four had served on the previous year's selection committee.

Defendant Rogers also altered the published requirements for the position. Initially, the job announcement required only a Ph.D. in Mechanical Engineering. The second job announcement included the requirement of a B.S. degree in Mechanical Engineering as well. Plaintiff does not have a B.S. degree in Mechanical Engineering but in another related filed.

While waiting for a new Head of the Department of Mechanical Engineering, Defendant Rogers appointed Defendant Onwubiko as Interim Department Head in August, 1989. At this time, Plaintiff was on leave from the university and was not scheduled to return until December 1989 or January 1990.

Unlike the first selection committee, which used a 100–point scale to rank the applicants, the new selection committee used a fifty-point scale. This committee ranked its applicants based on some criteria that were different than those considered by the first selection committee. Based on this new system, the committee initially ranked Defendant Onwubiko third, Plaintiff fourth, and Dr. Okeke seventh. Only the top three applicants were considered further.

After further consideration, Defendant Onwubiko was ranked first and received the recommendation of the selection committee. The committee based its decision, in part, on Defendant Onwubiko's experience as Interim Department Head and the fact that he held a B.S. degree in Mechanical Engineering. The committee forwarded their recommendation to Defendant Rogers, along with the names of the second and third highest ranking applicants. Defendant Onwubiko was eventually selected as Head of the Department of Mechanical Engineering.

Plaintiff asserts that Defendants were aware of his opposition to the university's prayer policy and that this affected their promotion consideration. He argues that their prejudice either toward his race or religious preference was manifested in the arbitrary change of selection criteria and ranking system, as well as the selection of Defendant Onwubiko as Interim Department Head. Finally, Plaintiff questions whether Defendant Rogers' reaction to Plaintiff's use of the term "tarbaby" with regard to an unrelated matter affected the decisionmaking process.

Next, Plaintiff has brought suit under 42 U.S.C. § 1983, contending that Defendants deprived him of his civil rights by offering Christian prayers at university-sponsored functions he is required, or at least encouraged, to attend. Plaintiff also complains that Defendant Onwubiko holds Bible study classes at the Engineering School. Plaintiff alleges that the promotion of these religious activities in such a manner violates the Establishment Clause of the First Amendment. He further contends that requiring students and faculty to attend such events violates their rights under the Free Exercise Clause of the First Amendment.

Since Plaintiff has been a member of the TSU faculty, Christian prayers have been offered at school-sponsored events, such as commencement ceremonies, faculty meetings, and dedication ceremonies. Plaintiff contends that he is either required to attend or expected to attend these functions. In fact, Plaintiff points out that participation in school-sponsored events is among the criteria upon which faculty members are evaluated. He contends that these religious activities have been initiated or encouraged by all of the individual Defendants, who have either planned or participated in school-sponsored events that include Christian prayers.

In response to Plaintiff's objections, Mary Walker, general counsel for the State University and Community College System of Tennessee, issued a memo instructing its member schools, including TSU, to refrain from including invocations and benedictions that contain religious messages from a particular denomination. (Deposition of Annie W. Neal, Exhibit No. 2). The memo, dated May 8, 1988, did state that nonsectarian or nondenominational prayers may be included in school-sponsored events. Although there

is some dispute as to whether Defendants complied with the instructions of Ms. Walker's memo, it is not disputed that prayers continued to be given at school-sponsored events after May 8, 1988. What constitutes a "generic" or "nonsectarian" prayer and whether or not the prayers offered complied with that definition are disputed issues.

In an effort to prevent the continued offering of prayers at university-sponsored events, Plaintiff filed the present suit on January 31, 1991. Nonetheless, Defendants continued to offer prayers at graduation and other school-sponsored events. Finally, in response to Plaintiff's Motion for a Preliminary Injunction filed April 19, 1993, Defendant Hefner stated that a prayer would not be given at the May 8, 1993, graduation ceremony. Thus, the Court denied Plaintiff's Motion for a Preliminary Injunction because his request had been rendered moot by Defendant Hefner's decision.

At the ceremony, however, school officials had substituted a "moment of silence" for the invocation that had been given in the past. Thus, after all participants in the graduation had been seated, Dr. Robert Hudson requested that the crowd stand and recognize a moment of silence. After a brief period of silence, an anonymous person or group of people in the audience spontaneously began to recite the Lord's Prayer, a well-known Christian prayer. Soon, many others in the audience joined in the prayer as well. When the crowd had finished reciting the prayer, Dr. Hudson returned to the podium and said, "Thank you. Please be seated." The ceremony then continued as planned. The next item on the program was a Christian hymn entitled "Let us Break Bread Together." The hymn, which was sung by the TSU choir, contains references to "God" and "Lord." Plaintiff was present throughout the graduation ceremony and claims that he was unaware that either a "moment of silence" or songs containing Christian references would be included as part of the program. After the ceremony, Plaintiff amended his motion for a preliminary injunction to request that Defendants also be enjoined from including a "moment of silence" in school-sponsored events.

Consistent with the format of the graduation ceremony, on June 8, 1993, Defendant Hefner instituted a policy prohibiting prayer at TSU functions. The policy does not forbid the recognition of a moment of silence.

At the graduation ceremony on August 7, 1993, a moment of silence was again recognized. Once again, a number of persons began to recite the Lord's Prayer during that moment of silence. Plaintiff now believes that if the practice of including a moment of silence in school-sponsored events is not prohibited, these audience prayers will continue to be given.

Defendants filed a Motion for Summary Judgment, arguing that the decisions not to promote Plaintiff were based on his qualifications rather than his religion or race. They further assert that Plaintiff's claims under Section 1983 either are barred under the Tennessee Statute of Limitations or are not cognizable under Section 1983 because Defendants' actions do not violate the First Amendment.

 In ruling on a motion for summary judgment, this Court must construe the evidence produced in the light most favorable to the non-moving party, drawing all justifiable inferences in his or her favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). A party may obtain summary judgment if the evidentiary material on file shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n. 4 (6th Cir.1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact which is disputed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510. If so, summary judgment dismissal is inappropriate.

 To prove his claim of discrimination, Plaintiff must first establish a prima facie case that he was discriminated against on the basis of his race or religion. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93

S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Once Plaintiff establishes a prima facie case, the burden shifts to Defendants "to articulate some legitimate, nondiscriminatory reason" for choosing not to promote Plaintiff. *Id.* If Defendants are able to articulate such a reason, the burden then shifts back to Plaintiff to show that the proffered reason was a mere pretext for discrimination. *Id.* Defendants do not dispute that Plaintiff has established a prima facie case of discrimination. Rather, they argue that they have proffered a legitimate, nondiscriminatory reason for their decision not to promote Plaintiff and that Plaintiff has not carried his burden of showing that reason is pretextual.

■ With respect to Plaintiff's Title VII claim for the denial of his application for promotion to dean, the Court agrees with Defendants. Defendants carried their burden by articulating a legitimate, nondiscriminatory reason—i.e., they relied on the recommendation of the selection committee which found that Defendant Rogers was more qualified to hold the position. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255–58, 101 S.Ct. 1089, 1094–96, 67 L.Ed.2d 207 (1981) (stating that a Title VII defendant has satisfied its burden under the *McDonnell Douglas* burden-shifting scheme when it proffers a reason for its decision even though it provides no factual basis for its explanation).

Plaintiff did not satisfy his burden of proving that the Defendants' proffered reason for denying him promotion to Dean of the School of Engineering is a mere pretext for discrimination. Plaintiff claims that the absence of the applications and many other documents concerning the selection committee's decision to hire Defendant Rogers as dean renders their decision suspect and establishes that the proffered reason is pretextual. To prove that the selection committee's decision was based on a discriminatory motive rather than the applicants' qualifications, Plaintiff must show that he was indeed more qualified than Defendant Rogers for the position. Although many of the documents concerning the selection committee's decision have been lost, Plaintiff's burden may have been satisfied by the introduction of other types of evidence, such as deposition testimony of committee members or an objective comparison of the applicants' qualifications in 1988.

■ With respect to Plaintiff's claim that Defendants discriminated against him when choosing not to promote him to Head of the School of Engineering, the Court disagrees with Defendants, finding that Plaintiff has submitted sufficient evidence from which a jury could find that Defendants' proffered reason is a mere pretext for discrimination. Once again, Defendants claim that their reason for not promoting Plaintiff to the position of Department Head was the selection committees' decisions to offer the position to other applicants. Plaintiff has submitted a great deal of evidence that this reason may be pretextual. First, he questions why Defendant Rogers did not provide to the selection committee all of the biography material he requested. Then, he notes that Defendant Rogers changed the qualifications for the position when the second selection committee was assembled. The position now required a B.S. degree in Mechanical Engineering, which Plaintiff did not hold. Next, Plaintiff points out that the second selection committee changed the process by which applicants would be judged. Finally, he notes that Defendant Rogers appointed Defendant Onwubiko as Interim Department Head, thus giving Defendant Onwubiko additional experience which helped him to receive the promotion instead of Plaintiff. Although Defendants claim that the rationale for these decisions was not discriminatory, the Court finds that Plaintiff has produced enough evidence from which a reasonable juror could find that Defendants' basis for deciding not to promote Plaintiff was indeed discriminatory. Therefore, the Court must deny Defendants' motion with respect to Plaintiff's Title VII claim for the denial of his application for promotion to Head of the School of Mechanical Engineering.

Next, Plaintiff has brought a claim under 42 U.S.C. § 1983, arguing that Defendants violated his rights under the Establishment Clause and the Free Exercise Clause of the First Amendment to the United States Constitution. Plaintiff has referred to numerous instances in which he believes Defendants

violated his First Amendment rights. These events include: (1) the holding of Bible study meetings by Defendant Onwubiko in the School of Engineering; (2) the offering of Christian and/or nonsectarian prayers or the recognition of a moment of silence at university-sponsored events, such as dedications, lecture series, and graduation; and (3) the singing of songs containing Christian references during commencement ceremonies. The Court will address each of these events and the First Amendment's effect upon them individually.

■ First, Plaintiff has argued that allowing Defendant Onwubiko to hold a Bible study group in the School of Engineering violates his First Amendment rights. Under the Supreme Court's holding in *Board of Education v. Mergens*, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990), Plaintiff clearly has not alleged facts sufficient to prove a violation under the First Amendment. In *Mergens*, a majority of the Court held that permitting a Christian Bible study group to meet during noninstructional time on school property as an extracurricular student organization does not violate the Establishment Clause when other clubs, whether or not religiously affiliated, are afforded the same opportunity to meet on school grounds as an extracurricular student organization. *Id.* at 253, 110 S.Ct. at 2356. *See also Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). Plaintiff has not alleged that other groups were denied permission to meet at the School of Engineering during noninstructional time, nor has he alleged that the group meets during instructional times or that the students receive some type of credit for attending. Therefore, the Court finds that Plaintiff has not alleged facts sufficient to prove his claim under Section 1983 regarding Defendant Onwubiko's Bible study group.

Next, Plaintiff contends that the offering of a prayer, whether Christian or nonsectarian, and the recognition of a moment of silence at graduation and other university-sponsored events violated his First Amend-

ment rights. Specifically, Plaintiff contends that the Defendants' decision to choose a Christian minister to offer a prayer, whether Christian or nonsectarian, violates his rights under both the Establishment Clause and the Free Exercise Clause. Plaintiff further argues that in light of his continual struggle to strike prayer from TSU's graduation ceremonies, the Defendants' decision to replace the prayer with a moment of silence, which later erupted into an audience recitation of the Lord's Prayer, calls into question the intent of the Defendants in issuing a moment of silence. He asserts that the Defendants intended for the moment of silence to be used for prayer and thus is violative of the Establishment Clause.

The Establishment Clause of the United States Constitution states, "Congress shall make no law respecting an establishment of religion...." This simple statement has led to great dissension not only among the citizens of this country but also among its courts. Indeed, Supreme Court opinions on the Establishment Clause apply at least one of five tests devised to determine whether state participation in religious activity is violative of the First Amendment. Despite the number of tests available to the Court, it has chosen to forego application of any test in at least one instance. *See Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (finding that the unique history of legislative prayer demonstrated that it was not violative of the Establishment Clause). This Court now must face the task of determining the appropriate test to be applied to the facts of this case.

In *Lee v. Weisman*, —— U.S. ——, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), the Supreme Court issued its most recent opinion concerning prayer in public schools. In *Lee*, Deborah Weisman, a student at Nathan Bishop Middle School, and her father, Daniel Weisman, brought suit to prevent the principal of her middle school, Robert E. Lee, from appointing a member of the clergy to pray at the commencement ceremony.[4] For many

---

4. Four days before the middle school graduation ceremony, the student and her father sought a temporary restraining order to prohibit school

officials from including a prayer in the ceremony. The United States District Court for the District of Rhode Island denied the motion for

years, the Providence School Committee and the Superintendent of Schools had a policy of allowing principals to invite members of the clergy to give invocations and benedictions at middle school and high school graduations. For Ms. Weisman's graduation from middle school, her principal had invited a rabbi to give a prayer at the commencement ceremony. The principal also provided the rabbi with a pamphlet entitled, "Guidelines for Civic Occasions" and advised him that prayers should be nonsectarian. *Id.* at ——, 112 S.Ct. at 2652.

■ In an opinion authored by Justice Kennedy, the Court abandoned the traditional test first announced in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), in favor of a new test that examines whether the state has *coerced* someone into participating in a religious activity. This "coercion test" is based upon the premise that "at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" *Lee*, —— U.S. at ——, 112 S.Ct. at 2655 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 678, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984)) (also citing *Allegheny County v. Greater Pittsburgh ACLU*, 492 U.S. 573, 591, 109 S.Ct. 3086, 3100, 106 L.Ed.2d 472 (1989), quoting *Everson v. Board of Education*, 330 U.S. 1, 15–16, 67 S.Ct. 504, 511–12, 91 L.Ed. 711 (1947)). Consequently, the Court found that the state, through its agent, Mr. Lee,[5] coerced Ms. Weisman into participating in the prayer.

■ To satisfy the coercion test, a plaintiff must show that she was forced to participate in a religious activity. The Court found that although Ms. Weisman was not forced to attend the graduation ceremony, her presence was not voluntary in the true sense of the term; therefore, in order to reap the "intangible benefits which have motivated [her] throughout youth and all her high school years," the state requires her to join in prayer. *Lee*, —— U.S. at ——, 112 S.Ct. at 2659. The Court also found that her presence at the ceremony required her participation in the prayer, stating that public pressure, as well as peer pressure, forced her to stand or, at least, maintain respectful silence during prayer. *Id.* at ——, 112 S.Ct. at 2658. The Court considered this act of standing or remaining silent during the prayer to be the equivalent of participation in the prayer. *Id.* (stating that "a reasonable dissenter in this milieu could believe that the group exercise signified her own participation or approval of it").

■ Four Justices concurred with the holding in *Lee;* however, they wrote separately to clarify that proof of coercion, in their view, is not necessary to discover all violations of the Establishment Clause. *Id.* at ——, 112 S.Ct. at 2664 (Blackmun, J., concurring) (citing *Abington School District v. Schempp*, 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963); *id.* at 229, 83 S.Ct. at 1575 (Douglas, J., concurring); *Wallace v. Jaffree*, 472 U.S. 38, 72, 105 S.Ct. 2479, 2498, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring in judgment); *Comm. for Public Ed. v. Nyquist*, 413 U.S. 756, 786, 93 S.Ct. 2955, 2972, 37 L.Ed.2d 948 (1973)); *Lee*, —— U.S. at ——, 112 S.Ct. at 2671 (Souter, J., concurring). These Justices support the endorsement test first developed by Justice O'Connor in her concurrence in *Lynch v. Donnelly*, 465 U.S. 668, 690, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). *See Lee*, —— U.S. at ——, ——, 112 S.Ct. at 2664, 2667 (Blackmun, J., concurring) (stating that "our cases have prohibited

---

lack of adequate time to consider it. The student subsequently attended the ceremony at which a prayer was given. Nonetheless, the Supreme Court found that the student retained standing to bring suit because at the time the Court heard the controversy she was enrolled in a local high school, which also included a prayer as part of its commencement exercise. *Lee*, —— U.S. at ——, 112 S.Ct. at 2653–54.

**5.** The Court found that Mr. Lee, as principal of the middle school, is an agent of the state for purposes of determining state action under the Establishment Clause. Specifically, the Court noted that *his choice to have an invocation at the* graduation ceremony was "a choice attributable to the State, and from a constitutional perspective it is as if a state statute decreed that the prayers must occur." *Lee*, —— U.S. at ——, 112 S.Ct. at 2655.

government endorsement of religion, its sponsorship, and active involvement in religion, whether or not citizens were coerced to conform"); *id.* at ——–——, 112 S.Ct. at 2666–67 (Souter, J., concurring). The endorsement test asks whether the state activity involved constitutes either an endorsement or disapproval of religion. *Lynch,* 465 U.S. at 693, 104 S.Ct. at 1369–70 (O'Connor, J., concurring). The Justices concurred in the majority opinion authored by Justice Kennedy because they believed that applying the endorsement test to the facts of *Lee* would render the same result.

Finally, four Justices dissented in the majority opinion in *Lee.* In an opinion authored by Justice Scalia, these Justices discussed America's cultural history involving prayer and the legislative history behind the adoption of the Establishment Clause, finding that the Framers intended the clause to prevent "coercion of religious orthodoxy and of financial support *by force of law and threat of penalty.*" *Lee,* —— U.S. at ——, 112 S.Ct. at 2683 (Scalia, J., dissenting) (emphasis in original). They denounced the coercion test as "incoherent" and too difficult for judges to apply. *Id.* at ——, 112 S.Ct. at 2681 (Scalia, J., dissenting). Nonetheless, they assert that even if the Court applied the coercion test, it is "ludicrous" to find that Ms. Weisman's standing or remaining silent during a prayer amounted to participation. *Id.* at ——–——, 112 S.Ct. at 2681–82 (Scalia, J., dissenting).

■ It is apparent from the opinions written in *Lee* that there is no consensus regarding the Establishment Clause. This Court agrees with Justice Scalia and many other previous Supreme Court opinions that in order to interpret the meaning of the Establishment Clause properly it is necessary to examine the legislative history surrounding its adoption. *See id.* at ——, 112 S.Ct. at 2679 (Scalia, J., dissenting) (quoting *Lynch,* 465 U.S. at 673, 104 S.Ct. at 1359 (1984) (stating that an interpretation of the Establishment Clause must "compor[t] with what history reveals was the contemporaneous understanding of its guarantees")). *See also Marsh,* 463 U.S. at 790, 103 S.Ct. at 3335; *Schempp,* 374 U.S. at 294, 83 S.Ct. at 1609. (Brennan, J., concurring). The Court must refer to "historical practices and understandings" in determining the meaning of the Clause. "It is said that '[a] test for implementing the protections of the Establishment Clause that, if applied with consistency, would invalidate longstanding traditions cannot be a proper reading of the Clause.'" *Id.* at ——, 112 S.Ct. at 2678 (Scalia, J., dissenting) (quoting *Allegheny County,* 492 U.S. at 657, 670, 109 S.Ct. at 3135, 3142 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part)).

■ The Establishment Clause cannot require a complete separation between church and state because it is upon the very principles of the church that our nation was founded and continues to flourish.[6] "There

6. In *Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), Justice Douglas recognized:

The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter. Otherwise the state and religion would be aliens to each other—hostile, suspicious, and even unfriendly.... Prayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; "so help me God" in our courtroom oaths—these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amendment. A fastidious atheist or agnostic could

even object to the supplication with which the Court opens each session: "God save the United States and this Honorable Court."

We would have to press the concept of separation of Church and State to these extremes to condemn the present law on constitutional grounds....

We are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the reli-

is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Lynch,* 465 U.S. at 674, 104 S.Ct. at 1360. These traditions are too numerous to mention in this opinion, but some examples include: (1) the official recognition of Thanksgiving as a national holiday on which to give thanks to God, *id.* at 675, 104 S.Ct. at 1360 (*citing* Ch. 167, 16 Stat. 168); (2) the congressional decision to prescribe "In God We Trust" as our national motto, *id.* at 676, 104 S.Ct. at 1361 (citing 36 U.S.C. § 136); (3) the inclusion of the language "One nation under God" in our Pledge of Allegiance to the American flag, *id.;* and (4) presidential proclamations recognizing a National Day of Prayer "on which [day] the people of the United States may turn to God in prayer and meditation at churches, in groups, and as individuals." *Id.* (these proclamations were issued at the direction of Congress in 36 U.S.C. § 169h). Although, standing alone, these traditions would not justify contemporary violations of the Establishment Clause, they also serve to shed light on what the Framers' intended the Clause to mean and how they thought it should be applied. *Marsh,* 463 U.S. at 790, 103 S.Ct. at 3335.

Many opinions have focused on the legislative history surrounding the adoption of the First Amendment, ultimately concluding that the Framers must have intended to allow government to participate to some degree in religious activity. *See, e.g., Lee,* —— U.S. at —— – ——, 112 S.Ct. at 2679–81 (Scalia, J., dissenting); *Lynch,* 465 U.S. at 674, 104 S.Ct. at 1359–60; *Marsh,* 463 U.S. at 790–91, 103 S.Ct. at 3335–36. Justice Souter, howev-

er, in his concurring opinion in *Lee,* argued that the legislative history behind the adoption of the Establishment Clause supports the view that the Framers intended the Clause to prohibit "nonpreferential aid to religion". *Lee,* —— U.S. at —— – ——, 112 S.Ct. at 2668–69 (Souter, J., concurring). This Court finds Justice Souter's argument unconvincing because the evolution of the Clause indicates that Congress narrowed its scope from James Madison's initial proposal. The original proposal read: "The civil rights of none shall be abridged on account of religious belief or worship, nor shall any national religion be established, nor shall the full and equal rights of conscience be in any manner, or on any pretext, infringed." *Id.* at ——, 112 S.Ct. at 2668 (Souter, J., concurring) (quoting 1 Annals of Cong. 434 (1789)). Today, the First Amendment declares, "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. 1. By omitting any language equivalent to "nor shall the full and equal rights of conscience be in any manner, or on any pretext, infringed," the Framers clearly intended to narrow the scope of the First Amendment.

The Framers' intent is further demonstrated by their actions just three days prior to passage of the Bill of Rights. On September 22, 1789, the First Congress enacted a statute authorizing the payment of chaplains to open each legislative session with a prayer. *Marsh,* 463 U.S. at 788, 103 S.Ct. at 3334 (citing 2 Annals of Cong. 2180; § 4, 1 Stat. 71).[7] Three days later the Framers agreed upon the final draft of the Bill of Rights. *Id.* (citing S. Jour., 1st Cong., 1st Sess., 88; H.R. Jour., 1st Cong., 1st Sess., 121 (1826 ed.).

gious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe....

*Id.* at 312–14, 72 S.Ct. at 683–84.

7. The *Marsh* Court also noted that James Madison, who drafted the original proposal for the First Amendment, was one of the members of Congress appointed by the House of Representatives to consider the manner of electing chap-

lains for the legislature. *Marsh,* 463 U.S. at 788 n. 8, 103 S.Ct. at 3334 n. 8 (citing H.R. Jour., 1st Cong., 1st Sess., 11–12 (1826 ed.)). Madison also voted for the bill authorizing payment to legislative chaplains. *Id.* (citing 1 Annals of Cong. 891 (1789)). *Cf. Lee,* —— U.S. at —— n. 6, 112 S.Ct. at 2675 n. 6 (Souter, J., concurring) (stating that Madison later wrote that "it was not with [his] approbation, that the deviation from [the immunity of Religion from civil jurisdiction] took place in Congs., when they appointed Chaplains, to be paid from the Natl. Treasury") (citing Letter from J. Madison to E. Livingston (July 10, 1822), in 5 Founders' Constitution, at 105).

Also on that day, the House of Representatives resolved to recommend to the President that he declare a Thanksgiving Day upon which the nation might acknowledge "the many signal favors of Almighty God." *Id.* at 788 n. 9, 103 S.Ct. at 3334 n. 9 (quoting H.R. Jour., at 123, and citing S. Jour., at 88). "Clearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress." *Id.* at 788, 103 S.Ct. at 3334.

■ The plain meaning of the words of the Establishment Clause as written reflect this intent. In drafting the First Amendment, the Framers chose to use the word "establishment." To "establish" is defined as "to make a state institution of." Webster's New World Dictionary 465 (3d ed. 1991). Thus, when the Framers chose to prohibit Congress from making laws respecting an establishment of religion, they prohibited them from making laws that would make a state institution of religion. To prevent Congress from establishing religion is less restrictive than preventing Congress from "touching" [8] or otherwise preferring a religion or religion in general.

This interpretation of the Establishment Clause comports with Justice Goldberg's concurrence in *Abington School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), which was cited with approval in the majority opinion in *Lee.* Justice Goldberg observed:

The First Amendment does not prohibit practices which by any realistic measure create none of the dangers which it is designed to prevent and which do not so directly or substantially involve the state in religious exercises or in the favoring of religion as to have meaningful and practical impact. It is of course true that great consequences can grow from small beginnings, but the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow.

*Id.* at 308, 83 S.Ct. at 1616 (Goldberg, J., concurring), quoted in *Lee,* —— U.S. at ——, 112 S.Ct. at 2661. The Framers were concerned with government actions that had the potential to present a "real threat" to the establishment of a religion in our nation. As the Court in *Marsh* found that legislative prayer presents no more potential for establishing a national religion than providing school transportation, *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), beneficial grants for higher education, *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), or tax exemptions for religious organizations, *Walz v. Tax Comm'n,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), so this Court finds that permitting a prayer to be offered at a public university's graduation ceremony and other occasional university-wide functions presents no real threat of establishing religion. *See Lee,* —— U.S. at —— – ——, 112 S.Ct. at 2683–85 (Scalia, J., dissenting) (stating that the coercion with which the Framers were concerned was the "coercion of religious orthodoxy and of financial support *by force of law and threat of penalty* ") (emphasis in original).[9] This factor distinguishes the present case from the Supreme Court's prior opinions regarding school prayer, in which the Court struck down laws that permitted

---

**8.** During the drafting process, the House of Representatives ultimately rejected a proposal submitted by Samuel Livermore of New Hampshire, which read: "Congress shall make no laws *touching* religion...." 1 Annals of Cong. 434 (1789) (emphasis added). Instead, it redrafted the amendment and replaced the word "touching" with "establishing." *Lee,* —— U.S. at ——, 112 S.Ct. at 2669 (Souter, J., concurring) (citing 1 Documentary History of the First Federal Congress of the United States of America 136 (Senate Journal) (L. de Pauw ed. 1972), and 1 Annals of Cong. at 765).

**9.** In his concurrence in *Lee,* Justice Souter also appears to embrace the "real threat" theory. He states that "Madison himself respected the difference between the trivial and the serious in constitutional practice." *Lee,* —— U.S. at ——, 112 S.Ct. at 2678. Justice Souter simply disagrees with Justice Scalia that prayer at a middle or high school graduation ceremony does not present a great potential for establishment of religion.

or required school officials to offer prayers at the beginning of each school day. *See, e.g., Schempp,* 374 U.S. 203, 83 S.Ct. 1560; *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). Prayers that are offered daily in an instructional setting by an authority figure to young children present a much greater *potential* for establishing a religion because the frequency and atmosphere in which the prayers are offered would more likely lead the children to believe that the prayers are sanctioned by the State. *See Lee,* —— U.S. at —— ——, 112 S.Ct. at 2684–85 (Scalia, J., dissenting).

■ Plaintiff has challenged the offering of both sectarian and nonsectarian prayers. Heeding the Court's warning in *Marsh,* however, this Court will not focus on the content of the prayer. *Marsh,* 463 U.S. at 794–95, 103 S.Ct. at 3337–38 (1983). *See also Stein v. Plainwell Community Schools,* 822 F.2d 1406, 1412 (6th Cir.1987) (Wellford, J., dissenting). The Establishment Clause was written to prohibit not only the establishment of a particular religion but also the establishment of religion in general. *See Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968); *Engel,* 370 U.S. at 430, 82 S.Ct. at 1266–67; *Everson,* 330 U.S. at 15, 67 S.Ct. at 511. Thus, this Court finds that simply offering prayers, whether sectarian or nonsectarian, at a public university graduation ceremony does not violate the Establishment Clause because it does not carry with it the potential for establishing religion in general or any particular religion. Consequently, the recognition of a moment of silence, which has even less potential for establishing religion, does not violate the Establishment Clause either.

■ Even if this Court were to apply the coercion test supported by the majority in *Lee,* it cannot find that Plaintiff was in any way coerced into participating in the prayers. First, this Court would agree with Justice Scalia that a person who merely stands in respectful silence while a prayer is uttered, as Plaintiff apparently did in the present case, has not participated in that prayer. *Lee,* —— U.S. at —— —— ——, 112 S.Ct. at 2681–82 (Scalia, J., dissenting). One does not "participate" in prayer by merely listening or remaining quiet. One who remains silent while the rest of the audience applauds a speaker or entertainer cannot be said to join in their praise. Similarly, one who quietly listens during a speech cannot be said to espouse the views of the speaker. Likewise, a person who sits, or even stands, in silence while a prayer is being offered cannot be said to either participate or agree with the prayer uttered.

■ Plaintiff argues that as a faculty member he is required, or at least expected, to attend graduation and other university functions. He argues that his required attendance at these events is equivalent to the state coercing his participation in the prayers offered at the events. Defendants contend Plaintiff's attendance at graduation is not mandatory, and Plaintiff is not penalized or disciplined for not attending. The Court finds, however, that simply because Plaintiff is present at these functions does not mean that he is participating in the prayers given at the functions.

■ The majority in *Lee* did note that its opinion did not address whether mature adults placed in a similar situation would be coerced into participation. *Id.* at ——, 112 S.Ct. at 2658–59. The majority placed particular emphasis on the age of the plaintiff in *Lee,* stating that adolescents were highly susceptible to peer pressure toward conformity. *Id.* at ——, 112 S.Ct. at 2659 (citations omitted). In the present case, Plaintiff is a tenured faculty member who follows the Hindu religion. His attendance at the graduation ceremony does not raise the same constitutional concerns as those cases involving school-age children. The Court has generally recognized a decreased risk of establishment where adults are concerned. For example, in *Marsh,* the Court stated, "The Establishment Clause does not always bar a state from regulating conduct simply because it 'harmonizes with religious canons.' Here, the individual claiming injury by the practice is an adult, presumably not readily susceptible to 'religious indoctrination,' or peer pressure...." *Marsh,* 463 U.S. at 792, 103 S.Ct. at 3336 (citations omitted). Similarly, Justice O'Connor noted in *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985),

that Presidential Proclamations for public prayers of Thanks are distinguishable from school prayer because "they are received in a noncoercive setting and are primarily directed at adults, who presumably are not readily susceptible to unwilling religious indoctrination." *Id.* at 81, 105 S.Ct. at 2502–03 (O'Connor, J., concurring). Accordingly, this Court finds that even if Plaintiff were considered to have "participated" in the prayers by his mere presence at the event, his age and maturity prevent him from being susceptible to any "religious indoctrination" or peer pressure under such circumstances. Therefore, his rights under the Establishment Clause have not been violated.

■ Thus, the Court holds that under either the coercion test as applied by the majority in *Lee* or under a test that considers the legislative history and plain meaning of the language in the Establishment Clause, school officials have not violated the Establishment Clause when prayers, whether sectarian or nonsectarian, are offered or a moment of silence is recognized at a university graduation ceremony or other ceremonial events.

■ Finally, Plaintiff has also complained that songs sung at the commencement ceremony contain Christian references and are therefore violative of the Establishment Clause.[10] For the reasons discussed in the previous section, the Court can find no violation of the Establishment Clause. Simply singing a song that contains a reference to God neither coerces Plaintiff's participation in worshipping God nor promotes the establishment of religion. These songs contain messages that have long been part of our country's heritage. Traditional practices like this "follow the best of our traditions" and "respect the religious nature of our people." *Zorach v. Clauson*, 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952). Courts have often commended this type of governmental acknowledgment of our religious heritage. *See, e.g., Lynch*, 465 U.S. at 675–77,

104 S.Ct. at 1360–61 (recognizing the countless illustrations of governmental acknowledgment of our national religious heritage, such as Thanksgiving Day and the Pledge of Allegiance). *See also Stein*, 822 F.2d at 1417 (Wellford, J., dissenting). This Court likewise finds that these songs recognizing not only America's beauty but also its religious heritage are appropriate and desirable at public events like the university's graduation ceremony. Also, as previously discussed, Plaintiff does not have to sing the offending song or agree with the lyrics or melody. Merely standing or sitting while the song is sung does not constitute forced participation.

■ Lastly, Plaintiff has argued that the offering of prayers at university-sponsored events he is required to attend violates his rights under the Free Exercise Clause of the First Amendment. Other than including this claim in his Complaint, however, Plaintiff has failed to pursue this argument. "The First Amendment encompasses two distinct guarantees—the government shall make no law respecting an establishment of religion or prohibiting the free exercise thereof—both with the common purpose of securing religious liberty." *Lee*, —— U.S. at ——, 112 S.Ct. at 2665 (Blackmun, J., concurring) (citing *Everson*, 330 U.S. at 40, 67 S.Ct. at 523, *Schempp*, 374 U.S. at 227, 83 S.Ct. at 1574, and *Wallace*, 472 U.S. at 50, 105 S.Ct. at 2486). Plaintiff has presented no argument that Defendants have interfered with his practice of Hinduism by offering prayers at university functions. Likewise, this Court can conceive of no argument upon which Plaintiff may base his Free Exercise claim. Accordingly, with respect to Plaintiff's claims under 42 U.S.C. § 1983, Defendant's Motion for Summary Judgment is hereby GRANTED.

For the foregoing reasons, Defendants' Motion for Summary Judgment is hereby GRANTED IN PART and DENIED IN PART. Accordingly, Plaintiff's claim for employment discrimination for denial of a pro-

---

**10.** Specifically, Plaintiff has complained that the graduation audience was asked to participate in the singing of "America the Beautiful," which contains references to "God" and "His grace," at the May 8, 1993 graduation ceremony. Plaintiff also complains that later in the ceremony the university choir sang a Christian hymn, entitled "Let Us Break Bread Together," which also contains references to "God" and "Lord."

motion to Head of the Department of Mechanical Engineering will proceed to trial.

It is so ORDERED.

*ORDER*

Presently pending before this Court is Defendants' Motion for Summary Judgment, to which Plaintiff has filed a Memorandum in Opposition. For the reasons more fully discussed in the accompanying Memorandum, Defendant's Motion for Summary Judgment is hereby GRANTED IN PART and DENIED IN PART.

Accordingly, with respect to Plaintiff's claims under 42 U.S.C. § 1983, Defendant's Motion for Summary Judgment is GRANTED. With respect to Plaintiff's claim of employment discrimination regarding the denial of his promotion to Head of the Department of Mechanical Engineering, Defendant's Motion for Summary Judgment is DENIED, and this claim will proceed to trial as scheduled.