Sarah E. COLES, et al., Plaintiffs,

v.

CLEVELAND BOARD OF EDUCATION, et al., Defendants.

No. 1:92–CV–2767.

United States District Court,
N.D. Ohio,
Eastern Division.

Dec. 17, 1996.

Joshua R. Cohen, Daniel E. Anker, Kohrman, Jackson & Krantz, Cleveland, OH, Kevin F. O'Neill, Cleveland–Marshall College of Law, Cleveland, OH, William M. Saks, Cleveland Heights, OH, Joan M. Englund, American Civil Liberties Union of Ohio Foundation, Inc., Cleveland, OH, J. Lewis Madorsky, Law Offices of J. Lewis Madorsky & Company, Cleveland, OH, for Sarah E. Coles, Gene T. Tracy, plaintiffs.

John R. Climaco, Richard M. Knoth, Climaco, Climaco, Seminatore, Lefkowitz & Garofoli, Cleveland, OH, for Cleveland Board of Education, defendant.

Sharon A. Jennings, James G. Tassie, Office of the Attorney General, Education Section, Columbus, OH, for John M. Goff, defendant.

Jerome F. Weiss, Cleveland, OH, for Anti–Defamation League, amicus.

### MEMORANDUM OPINION

DOWD, District Judge.

### I. INTRODUCTION

Sarah E. Coles, a former student in the Cleveland Public Schools, and Gene T. Tracy, a Cleveland public school teacher, filed this action against the Cleveland Board of Education ("the board") and John M. Goff, Superintendent of Public Instruction for the State of Ohio, alleging that the board's practice of opening meetings with a prayer or a moment of silence violates the federal and state constitutions. Motions for summary judgment were filed by the plaintiffs and by Goff. Magistrate Judge Patricia A. Hemann has issued a report and recommendation (Docket No. 73) recommending that the mo-

tion of the plaintiffs be granted with respect to the board and that Goff's motion be granted. Timely objections were filed by the board and by the plaintiff. For reasons set forth below, the Court accepts the magistrate's recommendation with respect to Goff and declines to accept the recommendation with respect to the plaintiffs. The Court shall grant summary judgment to the board and to Goff.[1]

### II. FACTUAL BACKGROUND

The administration of Cleveland's public schools has been characterized by divisiveness and rancor among board members and superintendents for most of the past two decades.[2] To say the least, such strife has not led to the betterment of the school system, which has been placed under the control of the state superintendent of public instruction by federal court order. See Reed v. Rhodes, Case No. 1:73–CV–1300 (N.D.Ohio) (order of March 3, 1995). The general election in November 1991 produced wholesale changes in the makeup of the school board, and on January 2, 1992, four new members of the seven-member board were sworn in. After the swearing-in ceremony, new board president Lawrence Lumpkin announced that school board meetings would henceforth open with a prayer. At the first meeting, a clergyman was called upon to pray and provided the following words:

> Would you pray with me? Eternal Creator of us all, we come before you this night, grateful for the new year, and a new day of hope for the education of Cleveland's children.
>
> While we give you special thanks for the new majority, we pray for a unanimous

---

1. For reasons which are unexplained, the board did not file a motion for summary judgment until after the filing of the magistrate's report and recommendation. The filing of a motion for summary judgment after the issuance of a report and recommendation is, to say the least, unusual. However, in this case the failure to file the motion at an earlier date works no prejudice upon the plaintiffs. This is because no new arguments were put forth in the motion, in which the board merely incorporated its separately filed objections to the magistrate judge's report. The plaintiffs oppose the motion, although not on grounds of tardiness. The Court is of the view that this case is appropriate for disposition on summary judgment, as neither side has even attempted to argue that there are genuine issues of material fact. The constitutional issue is a question of law. Thus the untimely nature of the board's summary judgment motion is of no legal consequence.

2. Exhibit B to the board's memorandum opposing summary judgment (Docket No. 35) contains a composite of newspaper articles reporting strife among board members and between board members and superintendents.

spirit to endeavor on behalf of children who too often have small voices, and little chance without champions in this important moment.

Oh God of history, remind us here, this night, that human experience proves, that if there is no reaffirmation, then there will be revolution.

Enable those entrusted with the leadership of this place, to be goaded into reaffirmation. Help them to amend the rules that protect the status quo, amend the rules that enforce—while not allowing for what should be; amend the rules which draw the cameras to this place, to refocus the lense [sic] and the light on the daily human triumphs taking place in the classrooms across the City.

Oh God, who offers reaffirmation in each of the voters, be in the hearts and minds of the decision makers in this place, that their choices will be acceptable in your sight, and which in all things will enable teachers to teach, and students to learn in excellent, loving, productive and positive city schools. Amen.

(Minutes of board meeting of 1/2/92 at pp. 3–4). In an affidavit board president Lumpkin provided the following rationale for initiating opening prayer:

Prior to January 2, 1992, the strife and acrimony of School Board meetings was well known. Often times, the School Board would be filled with so much acrimony from members and the attending public that little substantive business was accomplished. However, since the School Board began opening the public meetings with prayer or a moment of silence, a more businesslike and professional decorum prevails. Through solemnization of the proceedings, both members of the school board and attendees have taken on a greater respect for the process and certainly attach importance to its School Board's activities. Through this practice and the efforts of the Board members, the School Board has been able to undertake more substantive business than was true in the past.

(Lumpkin affid. at ¶ 4). Lumpkin also stated in his affidavit that no one is required to attend the board meetings and that those choosing to attend are not required to participate in the prayer or moment of silence. (Id. at ¶¶ 5–6).

The evidence indicates that prayers have been offered by representatives of the Protestant, Roman Catholic, Jewish and Muslim faiths. On occasions when the person scheduled to offer the prayer was not in attendance, the meeting was opened with a moment of silence followed by the board president saying, "Amen." In January 1996, the Reverend Stephen Sullivan became president of the board. Since that time, rather than recruiting someone else to offer a prayer, Rev. Sullivan has personally offered a prayer or requested a moment of silence for prayer at the outset of meetings. (Sullivan affid. at ¶¶ 2–3). The board never has adopted a resolution or taken other official action with respect to providing an opening prayer or moment of silence.

In 1992, when plaintiff Coles was a 13–year–old math student at John Adams High School, she was invited to a board meeting to receive special recognition for her outstanding academic performance. Coles said in an affidavit she was "shocked and surprised" to hear a prayer at the opening of the meeting. (Coles affid. at ¶ 4). She said she believed that the prayer, which was offered by a Baptist minister, "showed favoritism to Christians and could have offended anyone of another religion attending the meeting." (Id. at ¶ 5). Coles attended another board meeting in 1994 to be honored for receiving a scholarship to Case Western Reserve University. The meeting again opened with prayer.[3] Coles has since graduated from John Adams High School and is attending Case Western Reserve University.

Plaintiff Tracy is a Cleveland public schools math teacher who attends every meeting and takes advantage of the public comment portion to address the board on virtually every occasion. Tracy prefaces his remarks (which usually pertain to environ-

**3.** Coles' affidavit was filed after her attendance at the 1992 meeting, and the record does not appear to contain her reaction to the prayer at the 1994 meeting.

mental matters) by registering his opposition to the opening prayer. Typical of Tracy's comments were his admonition to the board at the March 12, 1992, meeting:

> Good evening. Need I again remind the board that this is not a parochial school system and prayer does not belong at this board meeting. You are in violation of [the] constitution, church and state separation. Wake up.

Tracy said in an affidavit that he must arrive early for meetings to ensure getting a seat and thus cannot remain outside the meeting room during the prayer. He said he avoids rising for the prayer or saying "Amen" "or in some other fashion [I] go out of my way to avoid full participation in the prayer. Nonetheless, I feel humiliated, demeaned and physically coerced into attending and participating in these prayers." (Tracy affid. at ¶ 10).

Coles and Tracy filed suit in 1992, asserting that the board's practice of opening meetings with prayer violates the Establishment Clause of the First Amendment of the United States Constitution and Article I, Section 7 of the Ohio Constitution.[4] The case originally was assigned the docket of Chief Judge George W. White, who referred the matter to Magistrate Judge Hemann on February 29, 1996, for preparation of a Report and Recommendation. The case was transferred to the docket of the undersigned on April 1, 1996. Because of the Court order placing the Cleveland public schools under the control of the state superintendent of public instruction, the complaint was amended earlier this year to include Goff as a defendant.

### III. THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Magistrate Judge Hemann recommended that Superintendent Goff's motion for summary judgment be granted because under *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a supervisor cannot be held liable on a theory of *respondeat superior* in actions brought under 42 U.S.C. § 1983. The magistrate

4. Article I, Section 7 states that all Ohio citizens have the right "to worship Almighty God accord-

judge noted there was no evidence supporting liability on the part of Goff under anything other than a *respondeat superior* theory, as there was no indication that Goff had supervisory authority over the board or that he condoned the practice of starting meetings with prayer.

However, the magistrate judge recommended that the plaintiffs be awarded summary judgment against the board on their Establishment Clause claim. She stated the board's prayer occurred in a school setting and was therefore governed by the line of Supreme Court cases applying the Establishment Clause in the public school context.

Magistrate Judge Hemann found that the board's actions failed the three-part test proffered by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) because 1) the prayers did not have a secular purpose; 2) the primary effect of the prayers advanced religion; and 3) the prayers fostered excessive government entanglement with religion.

The magistrate judge conceded that the Supreme Court has decided some recent Establishment Clause cases without reference to *Lemon* and noted that the defendants challenged the continued vitality of the test. Accordingly, she also analyzed the case under the reasoning of *Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), a case in which the Supreme Court invalidated a Rhode Island public school district's use of prayer at a high school graduation. The magistrate judge considered the board's prayer to be the same type of "state-sponsored and state-directed religious exercise" which was invalidated in *Lee*. (Report and Recommendation ["R & R"] at 24).

The board's prayer policy also was analyzed under an "endorsement" test which the magistrate judge found to be "the emerging Supreme Court test." (*Id.* at 27). The R & R stated that the endorsement test "asks whether, judged by a reasonable observer, the challenged state practice has the effect of promoting or endorsing religious beliefs."

ing to the dictates of their own conscience."

*(Id.)* In the magistrate judge's view, a practice of prayer led by a school board president could not be perceived in any way other than promoting religion.

Finally, the magistrate judge considered and rejected the board's argument that its policy fell within the confines of *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), which held that the policy of employing a chaplain with tax dollars to provide an opening prayer for the Nebraska state legislature was not unconstitutional. She distinguished *Marsh* on the basis that the challenged prayer in the instant case occurs in the context of a public school system. She noted that *Lee v. Weisman, supra,* which banned prayer at a public high school graduation, rejected *Marsh's* "tradition" rationale in part because of the essentially mandatory nature of graduation and the impressionability of youth. She also noted that *Marsh* rested on the fact that legislative prayer has been a part of our nation's tradition since the construction of the Bill of Rights while prayer by the Cleveland board commenced only in 1992.

Magistrate Judge Hemann found it unnecessary to reach the state constitutional claim because of her disposition of the federal claim in favor of the plaintiffs.

## IV.  ANALYSIS

### A.  Standard of Review

28 U.S.C. § 636(b)(1)(C) provides that a district judge shall make *de novo* determination of "those portions of the report or specified proposed findings or recommendations to which objection is made." The board urges *de novo* review of the entire R & R, arguing that the magistrate judge's factual

and legal conclusions are "interrelated and incapable of separate review and analysis." (Board objections at 6). The board goes on to provide a laundry list of alleged factual and legal errors. In the Court's view, the board's objections to the report and recommendation are sufficiently comprehensive to warrant *de novo* review of the factual and legal conclusions upon which the recommendation of summary judgment in favor of the plaintiffs was based.[5]

### B.  The Establishment Clause and the Tradition of Public Prayer

■ "There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Lynch v. Donnelly,* 465 U.S. 668, 674, 104 S.Ct. 1355, 1359, 79 L.Ed.2d 604 (1984). This "unbroken history" coexists with the Establishment Clause of the First Amendment to the United States Constitution which provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The question in this case is whether the board's policy[6] of opening meetings with prayer violates the Establishment Clause. The issue of prayer in the context of a public school board meeting is one of first impression.

As Justice Holmes said, "[A] page of history is worth a volume of logic." *New York Trust Co. v. Eisner,* 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921). Examining the history of public prayer, particularly as it appeared to be understood by the Framers of the First Amendment, is an appropriate starting point in analyzing the merits of the instant case.[7]

5.  The plaintiffs have filed objections to the recommendation that summary judgment be granted in favor of Goff. They have advanced *no new* arguments, merely attaching the relevant portions of their memorandum in opposition to Goff's motion for summary judgment. Because the Court finds that the offering of a prayer or moment of silence is not unconstitutional, there is no need to address the objections with respect to Goff.

6.  The Court rejects the board's argument that there is no state action because the prayer is arranged or led by an individual member of the

board and that there is no official policy of opening meetings with prayer. Such an argument elevates form over substance. Prayers or moments of silence have occurred at every meeting in the past five years. The board cannot escape such a fact simply by not having made the practice "official" through resolution.

7.  For a detailed account of how the Framers settled upon the precise language of the Establishment Clause, *see Wallace v. Jaffree,* 472 U.S. 38, 92–98, 105 S.Ct. 2479, 2508–11, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting).

The very week the First Congress approved the Bill of Rights, including the Establishment Clause, it also enacted legislation providing for paid chaplains for the House and the Senate. That Congress included seventeen draftsmen of the Constitution. As the Supreme Court said in *Marsh, supra,* "Clearly the men who wrote the First Amendment Religion Clauses did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress." *Id.,* 463 U.S. at 788, 103 S.Ct. at 3334. *See also Myers v. United States,* 272 U.S. 52, 174–75, 47 S.Ct. 21, 44–45, 71 L.Ed. 160 (1926) (observing that the First Congress "was a Congress whose constitutional decisions have always been regarded, as they should be regarded, as of the greatest weight in the interpretation of that fundamental instrument").

Within a few days of voting to accept the Bill of Rights, the House of Representatives passed a resolution asking President George Washington to issue a Thanksgiving Day proclamation. The resolution asked the President to "recommend to the people of the United States a day of public thanksgiving and prayer, to be observed by acknowledging with grateful hearts the many and signal favors of Almighty God, especially by affording them an opportunity peaceably to establish a form of government for their safety and happiness." 1 J. Richardson, Messages and Papers of the Presidents, 1798–1897, p. 64 (1897) (quoted in *Wallace,* 472 U.S. at 101, 105 S.Ct. at 2513 (Rehnquist, J., dissenting)). President Washington complied, and his proclamation recommended that November 26, 1789, be devoted

> to the service of that great and glorious Being who is the beneficent author of all the good that was, that is, or that will be; that we may then all unite in rendering unto Him our sincere and humble thanks for His kind care and protection of the people of this country previous to their becoming a nation; ... for the civil and religious liberty with which we are blessed,
> ...

*Id.* (quoted in *Wallace,* 472 U.S. at 102, 105 S.Ct. at 2513 (Rehnquist, J., dissenting)). The tradition of an annual presidential Thanksgiving Day proclamation has carried forward to the present day.

There are countless examples of government deference to religion in our history. In addition to paid chaplains for the House and Senate, the government provides chaplains for the military forces, and state legislatures have employed chaplains as well. Thanksgiving and Christmas Day are national holidays based upon religious observations. Our national motto is "In God We Trust," 36 U.S.C. § 186, and that motto appears on our currency. 31 U.S.C. § 5112(d)(1). Meetings of public bodies often commence with the Pledge of Allegiance to the American flag, a pledge which includes the language "one nation under God." 36 U.S.C. § 172. Congress has directed the President to proclaim an annual National Day of Prayer. 36 U.S.C. § 169h. The Supreme Court and other federal courts have opened with the invocation "God save the United States and this Honorable Court" since the days of Chief Justice Marshall. 1 C. Warren, The Supreme Court in United States History 469 (1922). Thus the nation has a tradition of "accommodation of all faiths and all forms of religious expression, and hostility toward none." *Lynch,* 465 U.S. at 677, 104 S.Ct. at 1361.

### C. Supreme Court Establishment Clause Jurisprudence

Against this historical and traditional background, in addressing a challenge based upon the Establishment Clause, "we must reconcile the inescapable tension between the objective of preventing unnecessary intrusion of either the church or the state upon the other, and the reality that, as the Court has so often noted, total separation of the two is not possible." *Lynch,* 465 U.S. at 672, 104 S.Ct. at 1358.

It also has been observed that "[t]he case-law developed under the Establishment Clause has grown very complex, and there seems to exist a case for and against each proposition furthered by any party. There is a common thread, however ...: A common-

sense balancing of the danger of Government establishment of religion with the recognition that religious traditions are a part of our nation's fabric." *Jager v. Douglas County School Dist.*, 862 F.2d 824, 841 (11th Cir.) (Roney, J., dissenting), *cert. denied*, 490 U.S. 1090, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989). *See also Wallace v. Jaffree*, 472 U.S. 38, 107, 105 S.Ct. 2479, 2516, 86 L.Ed.2d 29 (1985) ("[O]ur Establishment Clause cases have been neither principled nor unified") (Rehnquist, J., dissenting).

At one time the Supreme Court appeared to have settled upon a three-part test for determining whether state action violates the Establishment Clause. In *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the court held:

Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion.

*Id.* at 612–13, 91 S.Ct. at 2111–12 (quotation and citations omitted). Over the years, however, the *Lemon* test was sometimes not applied, even by the Supreme Court, in Establishment Clause cases. Conceding as much, the Court in *Lynch, supra*, wrote:

In each case, the inquiry calls for linedrawing; no fixed, *per se* rule can be framed. The Establishment Clause like the Due Process Clauses is not a precise, detailed provision in a legal code capable of ready application. The purpose of the Establishment Clause was to state an objective, not to write a statute. The line between permissible relationships and those barred by the Clause can no more be

straight and unwavering than due process can be defined in a single stroke or phrase or test. The Clause erects a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship.

*Id.*, 465 U.S. at 678–79, 104 S.Ct. at 1361–62 (quotations omitted).[8]

Although the fact-specific nature of the Supreme Court cases does not lend itself to clear application to a new fact situation, there are certain themes which can be carried away from overall Establishment Clause jurisprudence. First, there is not a hermetic wall between government and religion; there are circumstances in which state-sanctioned prayer or other religious activity is not deemed a violation of the clause. *See, e.g., Marsh, supra* (prayer at start of legislative day constitutional) *Lynch, supra* (creche as part of Christmas display permissible); *County of Allegheny, supra* note 8 (although creche not permissible because it was sole focus of one display, a menorah was permissible because it was part of a larger display featuring Christmas tree). Second, while the precise method of analysis varies from case to case, a recurring theme is whether the religious activity "in reality ... establishes a religion or religious faith, or tends to do so." *Lynch*, 465 U.S. at 678, 104 S.Ct. at 1361.

Third, due to the impressionability of youth and the compulsory nature of school attendance, the Supreme Court applies the Establishment Clause strictly in a public school setting. *See, e.g., Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (voluntary nondenominational prayer in classroom impermissible); *School Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (voluntary reading from Bible or recital of Lord's prayer at start of day impermissible); *Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (statute providing moment

---

8. The exceedingly fact-specific nature of an Establishment Clause inquiry is illustrated by comparing *Lynch* with *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). In *Lynch*, the presence of a creche or Nativity scene in a town's Christmas decorations was held not to violate the Establish-

ment Clause, in part because it was surrounded by secular Christmas figures and objects such as Santa's house and his reindeer. In *County of Allegheny*, the presence of a creche as a municipal decoration was held to be impermissible because the creche stood alone as a display distinct from other Christmas decorations. *Id.* at 598–99, 109 S.Ct. at 3103–04.

of silence at outset of school day, passed with the purpose of returning voluntary prayer to school, impermissible).

In *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), the Supreme Court addressed a public school district's practice of having its principals arrange for clergy to give invocations and benedictions at graduation. The principals gave the clergy a pamphlet containing guidelines for the composition of public prayers at civic ceremonies and advised that the prayers should be nonsectarian. The Court held that arranging for clergy to offer prayers as part of an official public school graduation ceremony was forbidden by the Establishment Clause. The Court cited as the following facts as "dominant" in the case: 1) state officials direct the performance of a formal religious exercise at graduation, and 2) attendance and participation at graduation, although not required, is "in a fair and real sense obligatory." *Id.* at 586, 112 S.Ct. at 2655. The state's involvement in the prayer, manifested through the control of the principal over the clergy and the content of the prayer, violated the Establishment Clause. *Id.* at 587, 112 S.Ct. at 2655.

The Court recapped a number of public school related Establishment Clause cases and noted "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Id.* at 592, 112 S.Ct. at 2658. And it rejected the notion that the voluntary nature of attendance at high school graduation distinguishes the situation from cases involving prayer in a classroom in which the law requires attendance:

> Law reaches past formalism. And to say a teenage student has a real choice not to attend her high school graduation is formalistic in the extreme.... Everyone knows that in our society and in our culture high school graduation is one of life's most significant occasions.... [A]bsence would require forfeiture of those intangible benefits which have motivated the student through youth and all her high school years.

*Id.* at 595, 112 S.Ct. at 2659. Thus *Lee,* in discussing the Court's jurisprudence with respect to school-related prayer, focused on the coercive pressures of the school setting and the mandatory or quasi-mandatory nature of attendance in the classroom or at major school events.

### D. The Marsh v. Chambers "Legislative Prayer" Exception

Although the Supreme Court has thus adopted a very strict line with respect to prayer in school and school-related events, it has been much more yielding to prayer in the legislative context. In *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), a Nebraska legislator challenged the state legislature's practice of beginning each session of the legislature with a prayer by a chaplain paid by the state with the legislature's approval. The Supreme Court held such a practice to be constitutional, noting that "[t]he opening of sessions of legislative and other deliberative bodies with prayer is deeply embedded in the history and tradition of this country." *Id.* at 786, 103 S.Ct. at 3333.

Noting that final agreement was reached on the Bill of Rights on September 25, 1789, just three days after Congress authorized the appointment of paid chaplains, the Court stated,

> It can hardly be thought that in the same week Members of the First Congress voted to appoint and to pay a chaplain for each House and also voted to approve the draft of the First Amendment for submission to the states, they intended the Establishment Clause of the Amendment to forbid what they had just declared acceptable....

*Id.* at 790, 103 S.Ct. at 3335. The Court in *Marsh* indicated that the Framers of the Constitution did not consider opening prayers to be tantamount to an attempt to establish a religion:

> [T]he delegates did not consider opening prayers as a proselytizing activity or as symbolically placing the government's official seal of approval on one religious view. Rather, the Founding Fathers looked at invocations as conduct whose effect harmonized with the tenets of some or all religions. The Establishment Clause does

not always bar a state from regulating conduct simply because it harmonizes with religious canons.

*Id.* at 792, 103 S.Ct. at 3336 (quotations omitted).

Lower courts, both before and after *Marsh,* have held that prayer at the outset of meetings of public bodies is not unconstitutional. *See, e.g., Bogen v. Doty,* 598 F.2d 1110 (8th Cir.1979) (county commissioners calling on clergyman for prayer); *Marsa v. Wernik,* 86 N.J. 232, 430 A.2d 888 (prayer at outset of borough council meetings), *app. dismissed and cert. denied,* 454 U.S. 958, 102 S.Ct. 495, 70 L.Ed.2d 373 (1981); *Lincoln v. Page,* 109 N.H. 30, 241 A.2d 799 (1968) (invocation at town meeting); *Colo v. Treasurer and Receiver General,* 378 Mass. 550, 392 N.E.2d 1195 (1979) (salaries for legislative chaplains); *Snyder v. Murray City Corp.,* 902 F.Supp. 1444 (D.Utah 1995) ("reverence portion" at outset of council meetings) (citing *Marsh* ).

### E. Applicability to the Instant Case

As the discussion in the foregoing two sections illustrates, the nation has a history of respecting religious tradition on the one hand and enjoining activity tending to "establish" a religion on the other hand. This is a delicate balance under any circumstance and is even more difficult when the underlying issue is related to public education. *See School Dist. of Abington Township, supra,* 374 U.S. at 230, 83 S.Ct. at 1575 ("The Court's historic duty to expound the meaning of the Constitution has encountered few issues more intricate or more demanding than that of the relationship between religion and the public schools") (Brennan, J., concurring).

Conceding this is a case of first impression, the magistrate judge based her analysis on a presumption that a meeting of a public school board of education should be analyzed as prayer in a "school setting." (R & R at 22, 26). Such a presumption was based upon a number of factors, including 1) the board members, including the member offering or soliciting prayer, are school employees acting in their official capacity; 2) a board meeting is a school-sponsored activity held in a school building, and 3) students were invited to attend meetings and sometimes received special recognition for academic achievement at meetings. The magistrate thus relied upon the line of cases involving prayers in classrooms and at graduation ceremonies in concluding that prayer or a moment of silence for prayer at a board meeting is unconstitutional.

The Court has one fundamental disagreement with the magistrate judge's report, and that disagreement is dispositive in this case. The Court is of the view that prayer at a school board meeting is of a different species than prayer in a classroom or at a graduation ceremony. A board meeting is fundamentally a meeting of adults, open to the public and conducted for the purpose of doing public business. This atmosphere is not the same atmosphere as a classroom or a graduation ceremony, which are fundamentally student functions meriting the particular Establishment Clause protections afforded to youths in Supreme Court jurisprudence.

Accordingly, the Court believes the proper point of inquiry in this case is not the so-called school prayer cases such as *Engel, supra* (classroom), *School District of Abington Township, supra* (classroom) and *Lee v. Weisman, supra* (graduation). The Court is of the view that the facts of this case are more closely associated with the so-called legislative or public body prayer exception articulated in *Marsh, supra,* and supported in state and lower federal courts.

The Supreme Court acknowledges "heightened concerns" in applying the Establishment Clause to the school setting. *Lee v. Weisman,* 505 U.S. at 592, 112 S.Ct. at 2658. *See also Abington School Dist.,* 374 U.S. at 230, 83 S.Ct. at 1576 ("[T]he constitutional prohibitions encounter their severest test when they are sought to be applied in the school classroom") (Brennan, J., concurring). In *Lee,* the Supreme Court's most recent major school prayer decision, the Court identified the following as "dominant facts [that] mark and control the confines of our decision:

State officials direct the performance of a formal religious exercise at promotional

and graduation ceremonies for secondary schools. Even for those students who object to the religious exercise, their attendance and participation in the state-sponsored religious activity are in a fair and real sense obligatory, though the school district does not require attendance as a condition for receipt of the diploma."

*Lee,* 505 U.S. at 586, 112 S.Ct. at 2655. Thus the Supreme Court has taken a strict stance with respect to prayer in a school setting due at least part to the "subtle coercive pressure in the elementary and public schools," *id.* at 592, 112 S.Ct. at 2658, and the mandatory or quasi-mandatory nature of attendance by students.

Such concerns carry far less force when applied to the context of a school board meeting. Such a meeting is a meeting of adults to conduct the business of schools. The fact that the *subject matter* of board meetings is school-related and that the *location* of board meetings is on school property does not implicate the underlying concerns which have led the Supreme Court to apply the Establishment Clause strictly to school-related functions, i.e., the potential coercion of impressionable students and the mandatory or quasi-mandatory nature of student attendance. Rather, a board meeting is fundamentally an adult gathering to conduct the business to which it is assigned, the governing of the schools. As such, the Court finds a board meeting more closely akin to a legislative session, *see Marsh, supra,* than a classroom or graduation ceremony.

Because a board of education is more administrative than legislative in nature, the case is not on all fours with *Marsh.* However-

er, by its own terms *Marsh* did not restrict itself solely to the context of legislatures. The Supreme Court noted, "The opening of sessions of legislative *and other deliberative public bodies* with prayer is deeply embedded in the history and tradition of this country." *Marsh,* 463 U.S. at 786, 103 S.Ct. at 3333 (emphasis added). The Court concluded that "the First Amendment draftsmen ... saw no real threat to the Establishment Clause arising from a practice of prayer *similar to that now challenged." Id.* at 791, 103 S.Ct. at 3335 (emphasis added). Moreover, opening prayers at bodies other than strictly legislative bodies have been countenanced by courts. *See* cases cited on page 1345 *supra.*

The magistrate noted that students are invited to board meetings and occasionally are honored for their academic or athletic achievement. She further found that the district student council president regularly reports to the board. The Court is of the view that these facts are not sufficient to transform this into a "school" case for purposes of analysis. The presence of a small number of students does not change the fact that the board is an elected body consisting of adults conducting public business in public meetings. Under any other analysis, a challenge could be made to prayer in state legislatures because student pages are present and many classes take field trips to legislative sessions.[9]

Thus the Court takes exception to the magistrate judge's characterization of this case as a case in a "school setting" warranting the analysis normally provided for prayer cases involving school classrooms and special school events such as graduation.[10] Rather,

---

**9.** As an adult, co-plaintiff Tracy is not as susceptible to coercion or religious indoctrination as a student, according to the rationale underlying Supreme Court and other federal court prayer cases. In addressing the status of the plaintiff in *Marsh,* the Supreme Court noted, "Here, the individual claiming injury by the practice is an adult, presumably not readily susceptible to religious indoctrination or peer pressure." *Id.* at 792, 103 S.Ct. at 3336 (quotations omitted). *See also Chaudhuri v. State of Tennessee,* 886 F.Supp. 1374 (M.D.Tenn.1995), in which the district court found prayer at a public university's graduation ceremony did not violate the Establishment Clause, in part because the complainant was an adult. The district court stated, "Even if Plaintiff

were considered to have 'participated' in the prayers by his mere presence at the event, his age and maturity prevent him from being susceptible to any 'religious indoctrination' or peer pressure under such circumstances. Therefore, his rights under the Establishment Clause have not been violated." *Id.* at 1387.

**10.** The Court also rejects the plaintiff's argument that receiving an award from a school board is similar to receiving a diploma at a graduation ceremony. Attending a board meeting, even to receive an award, cannot be considered "in a fair and real sense obligatory" in the same sense that attending high school graduation is considered obligatory. *Cf. Lee,* 505 U.S. at 586, 112 S.Ct. at

the Court finds the case better suited to the analysis of *Marsh* and other cases allowing prayer or prayer-related activity, such as chaplain programs, in legislative or other deliberative public bodies.

The plaintiffs argue that *Marsh* is not the appropriate frame of reference because the decision was based upon a tradition of legislative prayer embraced by the Framers of the Constitution and continuing until today. Because free public education was virtually nonexistent at the time the Constitution was drafted, it is inappropriate to assume the Framers also would have supported opening prayer in the context of the instant case, according to the plaintiffs. The Court is of the view that such a position pigeonholes *Marsh* too narrowly. In the Court's view, the significance of *Marsh* was the Supreme Court's finding, based on a historical analysis, that the drafters of the Establishment Clause did not see a conflict between the clause and the concept of prayer at the opening of a meeting of a public body. It is reasonable to assume the Framers would have applied the same reasoning to other deliberative bodies. Indeed, in the Court's view it is unreasonable to believe the Framers would have applied the Establishment Clause differently among different deliberative public bodies.[11]

Finally, the Court finds it unnecessary to analyze the precise content of the many prayers offered at the outset of board meetings over the course of several years. It is sufficient to say that the record does not support a finding that the board was using prayer as an attempt to convert audience members or to promote any particular belief. The Supreme Court's reasoning in *Marsh* is applicable here:

> The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.

*Id.* at 794–95, 103 S.Ct. at 3337–38.[12]

## V. CONCLUSION

Because the prayer at issue is the prayer of a public deliberative body and occurs in a fundamentally adult atmosphere, rather than in a student or school oriented atmosphere, the case fits most closely into the Supreme Court's *Marsh* analysis. As such, the practice of opening prayer does not violate the Establishment Clause of the Constitution or

2655. The *Lee* court stressed that "in our culture high school graduation is one of life's most significant occasions" from which "absence would require forfeiture of those intangible benefits which have motivated the student through youth." *Id.* at 595, 112 S.Ct. at 2659. Receiving an award from the school board, while salutary, does not carry the same significance in our culture as receiving a high school diploma.

11. The Court attaches no significance to the fact that the prayer in question originated only in 1992. School boards have existed in one form or another in Ohio since 1825. Legislation passed in that year divided townships into districts from which "directors" were elected to manage the schools. *History of Ohio's County Boards of Education, 1914–1989*, Ohio Department of Education, at 8. The 1854 *Annual Report of the Commissioner of Common Schools* reported 1,514 boards of education in the state. *Id.* at 14. School boards thus have a long history as public deliberative bodies in this state. In any event, *Marsh* does not stand for the proposition that the specific public deliberative body must have engaged in prayer since the beginning of the republic in order for the prayer to be constitutional.

No sound principle of constitutional law would support the notion that a public deliberative body is estopped from initiating an opening prayer because it does not have an unbroken history of using prayer.

12. The Court's ruling on the Establishment Clause claim is dispositive of the plaintiffs' alternate claim that the prayer in question violates Article I, Section 7 of the Ohio Constitution. "The Ohio Supreme Court has noted that the decisions of the United States Supreme Court can be utilized to give meaning to the guarantees found in Article I of the Ohio Constitution." *South Ridge Baptist Church v. Industrial Com'n of Ohio*, 676 F.Supp. 799, 808 (S.D.Ohio 1987), aff'd, 911 F.2d 1203 (6th Cir.1990), cert. denied, 498 U.S. 1047, 111 S.Ct. 754, 112 L.Ed.2d 774 (1991). Ohio courts have given no indication they would apply the state constitutional provision more stringently than the United States Supreme Court has applied the Establishment Clause of the First Amendment. *See, e.g., Rand v. Rand*, 18 Ohio St.3d 356, 358–59, 481 N.E.2d 609 (1985). Thus the Court finds that the board's opening prayer policy does not violate the Ohio Constitution.

Article I, Section 7, of the Ohio Constitution.[13]

For the foregoing reasons, the Court accepts the magistrate judge's recommendation that summary judgment be awarded to defendant Goff and declines to accept the recommendation that summary judgment be awarded to the plaintiffs with respect to the board. The Court hereby grants summary judgment with respect to Goff and to the board on both counts in the amended complaint. The Court shall issue a judgment entry contemporaneously with the issuance of this memorandum opinion.

IT IS SO ORDERED.

### JUDGMENT ENTRY

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Judgment Entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that the motion for summary judgment of the plaintiff is denied. It is further ORDERED, ADJUDGED and DECREED that the motions for summary judgment of the defendant Cleveland Board of Education and the defendant John M. Goff are granted with respect to both counts of the complaint. Each party to bear its own costs. Case closed.

IT IS SO ORDERED.

---

13. The Court reaches its decision despite the intemperate tone of the board's memorandum of objections to the report and recommendation. The magistrate judge did her customary outstanding job in preparing the report and recommendation, which was meticulously researched and cogently reasoned. The fact that the Court does not agree with the recommendation in this case does not lessen the Court's respect for the magistrate judge, and the Court finds many of the characterizations in the board's objections to be unwarranted.