**Sarah E. COLES, by her next friend, Elizabeth Lashley COLES, Plaintiff, Plaintiff–Appellant,**

**Gene T. Tracy, Plaintiff–Appellant,**

**v.**

**CLEVELAND BOARD OF EDUCATION, et al., Defendants–Appellees.**

**Nos. 97–3082, 97–3104.**

United States Court of Appeals, Sixth Circuit.

Argued March 11, 1998.

Decided March 18, 1999.

Joshua R. Cohen (argued and briefed), Kohrman, Jackson & Krantz, Cleveland, Ohio, Joan M. Englund (briefed), ACLU of Ohio Foundation, Inc., Cleveland, Ohio, for Plaintiffs–Appellants.

John R. Climaco, Climaco, Climaco, Seminatore, Lefkowitz & Garofoli, Cleveland, Ohio, Richard M. Knoth (argued and briefed), Arter & Hadden, Cleveland, Ohio, for Defendants–Appellees.

Elizabeth M. Harvey (briefed), Lisa C. Wood (briefed), Kathryn K. Conde (briefed), Nutter, McClennen & Fish, Boston, Massachusetts, for Amicus Curiae.

Before: RYAN, COLE, and GILMAN, Circuit Judges.

GILMAN, J., delivered the opinion of the court, in which COLE, J., joined. RYAN, J. (pp. 386–89), delivered a separate dissenting opinion.

## OPINION

GILMAN, Circuit Judge.

At issue in this appeal is whether the Cleveland Board of Education's practice of opening its meetings with a prayer is constitutionally permissible. This case puts the court squarely between the proverbial rock and a hard place. The rock is *Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), holding that opening prayers at high school graduation ceremonies violate the Establishment Clause of the First Amendment. The hard place is *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), ruling that opening prayers are constitutionally permissible at sessions of a state legislature.

Are the prayers in question more like "school prayers" prohibited by *Lee* or closer to "legislative prayers" permitted by *Marsh?* Reasonable minds can differ on this issue, as indeed they have in this very case. The magistrate judge below wrote a thoughtful report and recommendation concluding that *Lee* was controlling. The district judge, on the other hand, wrote an equally thoughtful opinion holding that *Marsh* was more on point. For the reasons set forth below, we find that this case is closer to the rock than to the hard place. We therefore **REVERSE** the judgment of the district court and hold that the Cleveland Board of Education's practice of opening its meetings with a prayer is constitutionally prohibited.

## I. BACKGROUND

The Cleveland public school system is comprised of several key components that together provide the city's youth with "a free, public elementary and secondary education." *DeRolph v. State*, 78 Ohio St.3d 193, 677 N.E.2d 733, 737 (1997); *see also* OHIO REV.CODE ANN. § 3313.48 (Anderson 1997) ("The ... school district shall provide for the free education of the youth of school age within the district."). These key components are the schoolhouses, teachers, administrators, and the local school board itself.

By statutory provision, local school boards are responsible for managing the myriad of day-to-day problems that typically surface in the operation of a public school system. *See* OHIO REV.CODE ANN. § 3313.47 (Anderson 1997). The school

boards, for example, are responsible for promulgating policies concerning the school system's curriculum, dress code, searches of student lockers, disciplinary rules, expulsion and suspension procedures, and the promotion of "ethical principles and democratic ideals" in students. *See* OHIO REV.CODE ANN. §§ 3313.60, 3313.665, 3313.20(A)-(B), 3313.661(A), 3313.602(B)-(C) (Anderson 1997).

Approximately twice per month during the school year, the Cleveland Board of Education ("the school board") holds a meeting that is open to the public. These public meetings usually take place on school property—either in the school board's administration building or in a schoolhouse. During the public-comment portion of the meeting, students and parents in attendance voice their concerns to school board members over a wide range of topics related to the operation of the public school system. At one school board meeting, for example, a student at Max Hayes Vocational High School questioned the wisdom of the board's comprehensive achievement program because the program would require funding cutbacks for his school's academic curriculum. Similarly, a parent, accompanied by her sixth-grade son, used another school board meeting as a forum to vocalize support for her son's special-needs instructor, whom the school district had recently fired.

In addition to this public-comment segment, school board meetings are required under certain circumstances to serve as a forum for addressing student grievances. When a student has been suspended or expelled from school, for example, the student can demand that a hearing be conducted before the entire school board during one of its public meetings. *See* OHIO REV.CODE ANN. § 3313.66(D)-(E) (Anderson 1997).

Beyond the normal dialogue that occurs between board members and students during these public meetings, a student representative regularly sits on the school board itself. Student representatives are re-sponsible for delivering a report to those in attendance that provides a student's perspective on activities taking place at school. In these reports, student representatives typically recap recent proceedings of the student council, inform the school board of student concerns and achievements, and describe upcoming student-sponsored events. At one board meeting, for example, a student at East Technical High School reminded board members of the upcoming visit by the school board president to a student council meeting and apprised the board of the student council's plans to hold a mock presidential election. Recognizing the input provided by these students, the school board's then-president Lawrence Lumpkin noted at the conclusion of one student representative's report: "It's really been a pleasure having student representatives at each meeting. They have added a great deal to our deliberations and to our focus on education."

The school board also regularly invites students to attend its meetings in order to receive awards for their academic, athletic, or community-service achievements. On these occasions, students, usually joined by friends and family, are asked by the board to come forward to receive their awards and to provide a few remarks to those in the audience. By way of illustration, a first-grade student was honored at one school board meeting for her participation in the Invent America program. In conjunction with her receipt of the award, the student explained to those in the audience how her invention worked. In sum, students not only attend school board meetings, but actively participate in the board's agenda.

Prior to 1992, the school board meetings were devoid of opening prayers. The local general election in November of 1991, however, produced wholesale changes in the makeup of the board. Most notably, four new members were sworn in on the seven-member school board on January 2, 1992. At the conclusion of the swearing-in cere-

mony, new board president Lawrence Lumpkin announced that school board meetings from that point forward would open with a prayer. Although Lumpkin gave no explanation at the time regarding the need for an opening prayer, he later stated in an affidavit that his decision was prompted over concerns about the "strife and acrimony" that marked board meetings before January of 1992. By opening meetings with a prayer, Lumpkin hoped to create a "more businesslike and professional decorum" at the meetings. According to Lumpkin, "[t]hrough solemnization of the proceedings, both members of the school board and attendees have taken on a greater respect for the process and certainly attach importance to its School Board's activities."

Since the policy has been in effect, school board meetings have opened with either a prayer offered by a member from the local religious community chosen by the school board president, a moment of silent prayer, or a prayer led by the school board president himself. With few exceptions, the clergy asked to offer the prayer have been members of the Christian faith. Furthermore, before each invocation, the school board president would ask the invited clergy to "lead us in opening prayer" and would add his own "amen" at the conclusion of the prayer. The following is typical of the prayers delivered at meetings of the school board:

> Our prayer to Thee this night is for the entire Board of Education, for all that makes up their individual personalities, that they may do justly, love mercy, to walk humbly in a consecrated way to their Lord. Help them to really understand that the old order changes, that the needs of children will and must come first. May they respect your word which says do not harm the children for their angels do stand before thy throne ready to defend their cause. So help them to further understand that what they say and do here is crucial to their eternity.

On numerous occasions, the prayers offered by the invited clergy member made specific reference to Jesus by name. For example, at the April 27, 1995 board meeting, Minister Jerry Birch delivered the following prayer:

> With all heads bowed, let us pray: Almighty God, our father in heaven, we come before you right now at this moment, Lord, just thanking you first of all for being God and being sovereign over all the earth. We thank you for being our creator. We thank you, Lord, for your grace, mercy, for your love and for your forgiveness.
>
> Lord, we ask your presence and involvement in these proceedings this evening, we ask that you would give our leaders, give them understanding and give them knowledge, that they may do their best for our children and for our city, that you might be glorified. In Jesus' name we pray. Amen.

Although most of the prayers delivered at the school board meetings carried religious overtones, some were secular in their tenor. Reverend Thomas Alcott, for example, read selections from the writings of Dr. Martin Luther King, Jr. for his opening prayer.

On occasions when the clergy member scheduled to offer the opening prayer was unable to attend, the school board president would open the meeting by asking attendees to join him for a few moments of "silent prayer." The school board president, often joined by others in attendance, would then conclude this period of silent prayer by saying "amen."

In January of 1996, the Reverend Stephen Sullivan was elected president of the school board. Before his election to the board, Reverend Sullivan had regularly been invited by the school board to offer a prayer at the commencement of its meetings. Since becoming school board president, Reverend Sullivan, rather than recruiting a fellow member of the clergy to offer a prayer, has personally offered a

prayer or requested a moment of silent prayer at the beginning of each meeting.

In 1992, Sarah Coles, then a student at John Adams High School, was invited to attend a school board meeting to receive an award for her outstanding performance on the ACT exam. At this meeting, a minister provided an opening prayer. Coles was "shocked and surprised" to hear a prayer at the opening of the board meeting. In fact, after hearing the prayer, Coles questioned whether she would attend another school board meeting if the practice continued. Despite these compunctions, Coles attended another school board meeting in May of 1994, when she was honored for receiving a scholarship to Case Western Reserve University. This board meeting also commenced with a prayer. Coles has since graduated from high school and is now attending college in Cleveland.

Gene Tracy is a math teacher at Martin Luther King, Jr. Law and Public Service Magnet High School in Cleveland. Tracy regularly attends school board meetings and uses the public-comment portion to address the board on various matters of concern. Tracy has frequently prefaced his remarks by admonishing the board that its practice of opening meetings with a prayer is unconstitutional. At one meeting, board president Lumpkin responded to Tracy's criticisms by commenting: "I want you to know, sir, that we have Christians within this organization. We have Christians that participate in the schools and I feel that the moment that you kick prayer out of the school, the Lord walks out of the school." Tracy stated in his affidavit that he must arrive early for board meetings to ensure getting a seat, and thus he cannot remain outside the meeting room during the opening prayer. Although Tracy has refused to participate in the prayers, he feels "humiliated, demeaned and physically coerced into attending and participating in these prayers."

Coles and Tracy filed suit in 1992 against the school board pursuant to 42 U.S.C. § 1983 and its state-law counterpart, alleging that the school board's practice of opening its meetings with a prayer or a moment of silent prayer violated the Establishment Clause of the First Amendment and Article I, Section 7 of the Ohio Constitution. After the filing of various affidavits and other documents, both parties moved for summary judgment.

## II. MAGISTRATE JUDGE'S RECOMMENDATION

These cross-motions for summary judgment were then referred to a magistrate judge for consideration. In a well-written and thoughtful report and recommendation, the magistrate judge recommended that the board's practice of opening its meetings with a prayer or a moment of silent prayer be found to violate the First Amendment's Establishment Clause. The magistrate judge first determined that school board meetings should be analyzed as prayer in a "school setting," because such meetings have all the earmarks of a school-related function. As later noted by the district court, "[s]uch a presumption was based upon a number of factors, including (1) the board members, including the member offering or soliciting prayer, are school employees acting in their official capacity; (2) a board meeting is a school-sponsored activity held in a school building, and (3) students were invited to attend meetings and sometimes received special recognition for academic achievement at meetings." *Coles v. Cleveland Bd. of Educ.*, 950 F.Supp. 1337, 1345 (N.D.Ohio 1996). Because the prayer at issue was found to take place in the public school context, the magistrate judge reasoned that the Supreme Court's decision upholding prayer at the beginning of state legislative sessions in *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), was inapplicable. Evaluating the constitutionality of the school board's opening prayer under the Supreme Court's three-part test in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745

(1971), the magistrate judge concluded that the school board's practice violated all three parts of the *Lemon* test. Objections to the magistrate judge's report and recommendation were timely filed with the district court.

## III. DISTRICT COURT'S OPINION

In an equally well-written and thoughtful opinion, the district court declined to adopt the magistrate judge's recommendation. Instead, the district court found that the school board's practice of opening its meetings with a prayer or a moment of silent prayer was constitutional.

The district court began by surveying the "unbroken" history of accepting public prayer in this country. The court traced numerous instances, stretching from the founding of the republic to the present day, where government officials have acknowledged or extolled religious beliefs during public ceremonies. Against this historical backdrop, the district court reviewed the manner in which the Supreme Court has expounded on and applied the Establishment Clause with respect to government-sponsored prayer. While acknowledging that the Supreme Court has "adopted a very strict line with respect to prayer in school and school-related events," *Coles*, 950 F.Supp. at 1344, the district court opined that the Court's position with respect to school-sponsored prayer was due in large measure to "the 'subtle coercive pressure in the elementary and [secondary] public schools' and the mandatory or quasi-mandatory nature of attendance by students." *Id.* at 1346 (quoting *Lee v. Weisman*, 505 U.S. 577, 592, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (internal citation omitted)).

The district court then turned its attention to the Supreme Court's decision in *Marsh*, in which the Court upheld the Nebraska legislature's practice of opening its sessions with a prayer delivered by a chaplain. In particular, the district court focused on the Court's statement in *Marsh* that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." 463 U.S. at 786, 103 S.Ct. 3330. Building upon *Marsh*'s reference to "other deliberative public bodies," the district court held that an opening prayer at meetings of any deliberative public body is constitutional because it is similarly clothed in this country's tradition of deference to public prayer.

Applying this analysis to the matter before it, the district court found "that prayer at a school board meeting is of a different species than prayer in a classroom or at a graduation ceremony." 950 F.Supp. at 1345. The "school prayer" line of cases is not applicable, in the district court's view, because "the underlying concerns which have led the Supreme Court to apply the Establishment Clause strictly to school related functions, i.e., the potential coercion of impressionable students and the mandatory or quasi-mandatory nature of student attendance[,]" carry far less force when applied to a school board meeting. *Id.* at 1346. As characterized by the district court, "[a] board meeting is fundamentally a meeting of adults, open to the public and conducted for the purpose of doing public business. This atmosphere is not the same atmosphere as a classroom or a graduation ceremony, which are fundamentally student functions meriting the particular Establishment Clause protections afforded to youths in Supreme Court jurisprudence." *Id.* at 1345.

The "adult atmosphere" present at school board meetings, coupled with the fact that the "board is an elected body consisting of adults conducting public business in public meetings," led the district court to conclude that prayers at school board meetings should be treated like those delivered at legislative sessions. *Id.* at 1345, 1347. Finding that the Supreme Court has been "much more yielding to prayer" by government officials, *id.* at 1344, the district court held that the school board's practice was constitutionally per-

missible under *Marsh*. This appeal followed.

## IV. ANALYSIS

### A. Standard of Review

■ We review a district court's order granting summary judgment *de novo*. *See Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir.1996). For summary judgment to be granted, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). "If the facts in a case are undisputed, one of the parties is entitled to judgment as a matter of law." *Niecko v. Emro Marketing Co.*, 973 F.2d 1296, 1304 (6th Cir.1992). Because no material facts are in dispute in the present case, one party or the other is appropriately entitled to summary judgment. The question remaining is whether the district court's application of the Establishment Clause to the undisputed facts in this case was correct.

### B. The Establishment Clause

■ The Establishment Clause of the First Amendment, made applicable to local school districts through the Fourteenth Amendment (*see Everson v. Board of Education*, 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947)), provides that a state "shall make no law respecting an establishment of religion." U.S. CONST. Amend. I. Although this constitutional directive is seemingly straightforward, the case law that has developed under the Establishment Clause has transformed it into a "blurred, indistinct, and variable barrier" whose application turns on sifting through the facts of each individual case. *Lemon*, 403 U.S. at 614, 91 S.Ct. 2105. A single factual difference consequently can serve to entangle or free a particular governmental practice from the reach of the Clause's constitutional prohibition. Com-

pare *Lynch v. Donnelly*, 465 U.S. 668, 687, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (holding that a nativity scene in a town square did not violate the Establishment Clause because it was surrounded by secular Christmas figures such as Santa Claus and his reindeer), with *Allegheny County v. Greater Pittsburgh ACLU*, 492 U.S. 573, 601–02, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (holding that a nativity scene in a town square did violate the Establishment Clause because it stood apart from the other Christmas decorations on display in the square). The issue of prayer at school board meetings is no different.

■ As acknowledged by the district court in this case, the Supreme Court has consistently held that school-sponsored religious activity transgresses the Establishment Clause. *See Coles*, 950 F.Supp. at 1344. On the other hand, in *Marsh*, the only case in which the Court has dealt with government-sponsored prayer outside the context of the public schools, it upheld the practice. Prayers at meetings of the school board do not neatly fit within the category of "school-sponsored prayer" as defined in *Lee*, because the prayers in this case are not said in front of the student body as a whole. By the same token, the practice challenged in this case does not neatly fall under the unique and narrow exception articulated in *Marsh*, because the school board is an integral part of the public school system.

■ In resolving this dilemma, the district court undertook a two-step analysis that in its view makes prayer at school board meetings analogous to the legislative-prayer exception in *Marsh*. First, the district court determined that the Supreme Court's rationale in the school prayer cases is essentially limited to concerns over the coercion of impressionable young students. Second, the district court found that board meetings are fundamentally adult gatherings, with the presence and participation of students only minor and incidental to that body's function and pur-

pose. The district court then noted that the school board shares a number of traits with other public deliberative bodies, like city councils. Because it concluded that school board meetings do not implicate the same concerns over the coercion of students as do other school-related functions, and because the school board is otherwise a deliberative public body, the district court found the rationale in *Marsh* controlling.

We respectfully disagree. Although meetings of the school board might be of a "different variety" than other school-related activities, the fact remains that they are part of the same "class" as those other activities in that they take place on school property and are inextricably intertwined with the public school system. Moreover, there is no question that the Establishment Clause jurisprudence controls this case. The only dispute is whether the school board's practice falls within the mainstream of school prayer cases, as did the graduation speaker in *Lee*, or instead is controlled by *Marsh*, a historical exception to the mainstream. To properly decide the issue, it is important to review the reasons that the Supreme Court has drawn a sharp line between government-sponsored prayer and the public schools.

## C. The School Prayer Cases

■ The Supreme Court's decisions striking down religious intrusion into the public schools have a dual basis. One is the fact that students are young, impressionable, and compelled to attend public schools, and the other is that public schools are particularly important to the maintenance of a democratic, pluralistic society. See *People of Illinois ex rel. McCollum v. Board of Education of School Dist. No. 71*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948) (Frankfurter, J., concurring), where Justice Felix Frankfurter referred to the unique role of the public school as "perhaps the most powerful agency for promoting cohesion among a heterogeneous democratic people," requir-

ing the public school as an institution to "keep scrupulously free from entanglement in the strife of sects." *Id.* at 216–17, 68 S.Ct. 461. See also *Engel v. Vitale*, 370 U.S. 421, 431, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), in which the Supreme Court held that the practice of beginning classes each day with a prayer composed by the New York Board of Regents was unconstitutional. It is against both of these concerns that the practices at issue in this case must be judged.

The Supreme Court's Establishment Clause jurisprudence has been remarkably consistent in sustaining virtually every challenge to government-sponsored religious expression or involvement in the public schools. These cases start with *McCollum, supra*, where the Court addressed a challenge to a state program that gave religious groups access to public school classrooms for religious instruction. In holding that the state program violated the Establishment Clause, the Court stated that "[n]either a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups, and *vice versa*." *Id.* at 210–11, 68 S.Ct. 461.

The next school prayer case the Court decided occurred over a decade after *McCollum*. In *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), the Court was presented with the constitutionality of beginning classes each day with a prayer, the content of which was composed by the New York Board of Regents. The lower courts had sustained the governmental practice because "the schools did not compel any pupil to join in the prayer over his or his parents' objection." 370 U.S. at 423, 82 S.Ct. 1261. In striking down the challenged practice, the Court held "that by using its public school system to encourage recitation of the Regents' prayer, the State of New York has adopted a practice wholly inconsistent with the Establishment Clause." 370 U.S. at 424, 82 S.Ct. 1261. The Court concluded that coercion by the state with regard to

students' religious beliefs was impermissible, holding that "[w]hen the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Id.* at 431, 82 S.Ct. 1261. The Court's analysis also made short shrift of the lower court's argument that because no student was coerced to take part in the daily prayer, the practice did not violate the Establishment Clause: "The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion and is violated ... whether those [governmental practices] operate directly to coerce nonobserving individuals or not." 370 U.S. at 430, 82 S.Ct. 1261.

The next year, in *School Dist of Abington Tp. v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), the Court reviewed the constitutionality of a state statute requiring schools to begin each day with readings from the Bible. In the course of striking down the state statute at issue in the case, the Court observed that although a showing of coercion would establish a violation of the Establishment Clause, such a showing is not required in all cases. The Court summed up the issue by stating that "a violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended." 374 U.S. at 223, 83 S.Ct. 1560.

From the Court's decisions in *Engel* and *Schempp,* it becomes apparent that the constitutional problem with prayer or Bible reading in public school classrooms does not arise solely from the coercive effect of compulsory attendance or from concern with the malleability of young minds. As these two cases make clear, coercion is not the full extent of the proper inquiry under the establishment clause. Mixing religious activity with a government institution designed to foster and educate youth in the values of a democrat-

ic, pluralistic society is troubling because of the special nature of public schools as "the symbol of our democracy and the most pervasive means for promoting our common destiny." *McCollum,* 333 U.S. at 231, 68 S.Ct. 461 (Frankfurter, J., concurring).

In its later school prayer cases, the Court has continued to address the same basic concerns that were expressed in *Engel* and *Schempp.* Government must not coerce religious activity, but coercion is not the only means by which government actions may violate the Establishment Clause. For example, in *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam), the Court invalidated a state statute requiring that a copy of the Ten Commandments be posted on the wall of each public school classroom in Kentucky. In a brief decision, the Court found the statute unconstitutional because the "pre-eminent purpose for posting the Ten Commandments on schoolroom walls [was] plainly religious in nature." 449 U.S. at 41, 101 S.Ct. 192. Nowhere in the Court's opinion did it attempt to analyze the constitutionality of the statute on the basis of the coercive nature of the public school setting.

In *Wallace v. Jaffree,* 472 U.S. 38, 40, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), the Court revisited the school prayer issue, reviewing a state statute that provided for "a period of silence ... for meditation or voluntary prayer" at the commencement of the first class each day. The Court invalidated the statute because it lacked a secular purpose. *See* 472 U.S. at 61, 105 S.Ct. 2479. Although the plaintiffs argued that the statute subjected children to religious indoctrination, the Court found no need to rely on this contention in order to strike down the statute. Instead, it noted that the reason for the special concern with prayer in the public school context derived from the understanding that the public school system is responsible for fostering democratic principles in this nation's youth. As explained by the Court: "[E]d-

ucating the young for citizenship is [the] reason for scrupulous protection of the Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." 472 U.S. at 61 n. 51, 105 S.Ct. 2479 (quoting *Board of Educ. v. Barnette*, 319 U.S. 624, 637, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943)). It was against this background that the Court considered the practice of government-sponsored prayers at public school graduation ceremonies in *Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992).

The Court's opinion in *Lee* began by noting that the following "dominant facts" marked and controlled the Court's decision: "State officials direct the performance of a formal religious exercise at promotional and graduation ceremonies for secondary schools." 505 U.S. at 586, 112 S.Ct. 2649. The fact that the government-sponsored prayer took place within the public school setting thus was enough for the practice to violate the Establishment Clause. As the Court observed: "The government involvement with religious activity in this case is pervasive, to the point of creating a state-sponsored and state-directed religious exercise in a public school." *Id.* at 587, 112 S.Ct. 2649.

The *Lee* opinion also considered attendance at the ceremonies "obligatory," not in the sense that a concrete detriment (such as failure to receive a diploma) would befall absentees, but in terms of the "intangible benefits" that would be lost by a student who felt compelled to be absent from the graduation ceremony. Fundamental to the Court's decision was that the activity challenged in *Lee* violated the most basic precepts of the First Amendment religion clauses:

> The First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State. The design of the Constitution is that preservation and transmission of

religious beliefs and worship is a responsibility and a choice committed to the private sphere, which itself is promised freedom to pursue that mission.

505 U.S. at 589, 112 S.Ct. 2649. The Court then noted that these "concerns have particular application in the case of school officials, whose effort to monitor prayer will be perceived by the students as inducing a participation they might otherwise reject." *Id.* at 590, 112 S.Ct. 2649.

■] Based on the above review of the Supreme Court's school prayer cases, two overriding principles can be discerned. The first is that "coercion" of impressionable young minds is to be avoided, and the second is that the endorsement of religion is prohibited in the public schools context. As Justice Blackmun stated in *Lee*, "our cases have prohibited government endorsement of religion, its sponsorship, and active involvement in religion, whether or not citizens were coerced to conform." 505 U.S. at 609, 112 S.Ct. 2649 (Blackmun, J., concurring). Both concerns are implicated by the prayer practices of the Cleveland School Board.

## D. The "Legislative Prayer" Exception

Despite the concerns detailed above, the school board argues that this is not really a "school prayer" case at all. Instead, the board argues that the facts of this case are more akin to the recitation of prayers at the opening of a state legislature. Although the Supreme Court has adopted a very strict line with respect to prayer in the public school system, it has been much more deferential to government-sponsored prayer in the legislative context. In *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), the Supreme Court reviewed the Nebraska legislature's practice of beginning each session with a prayer from a chaplain paid by the state. The Court began its analysis by comparing the Nebraska legislature's practice with the "unique history" of the United States Congress where, since its

first session in 1789, prayer offered by a paid chaplain commences each legislative session. As stated by the Court: "The tradition in many of the Colonies was, of course, linked to an established church, but the Continental Congress, beginning in 1774, adopted the traditional procedure of opening its sessions with a prayer offered by a paid chaplain.... Although prayers were not offered during the Constitutional Convention, the First Congress, as one of its early items of business, adopted the policy of selecting a chaplain to open each session with prayer." 463 U.S. at 787–88, 103 S.Ct. 3330 (internal citations and footnotes omitted).

The timing of this authorization for the appointment of paid chaplains was particularly important, because Congress reached a final agreement on the language of the First Amendment only three days later. As explained by the Court:

> It can hardly be thought that in the same week Members of the First Congress voted to appoint and to pay a chaplain for each House and also voted to approve the draft of the First Amendment for submission to the states, they intended the Establishment Clause of the Amendment to forbid what they had just declared acceptable....

*Id.* at 790, 103 S.Ct. 3330. From this, the Court concluded that "the First Amendment draftsman ... saw no real threat to the Establishment Clause arising from a practice of prayer similar to that now challenged." 463 U.S. at 791, 103 S.Ct. 3330. Because the opening of legislative sessions with the recitation of a prayer is deeply embedded in the history and tradition of this country, the Court found the Nebraska legislature's practice to be constitutionally permissible.

Lower courts, both before and after *Marsh,* have held that prayer at the beginning of meetings of various legislative bodies is constitutional. *See, e.g., Bogen v. Doty,* 598 F.2d 1110 (8th Cir.1979) (county commissioners calling on clergyman for prayer); *Snyder v. Murray City Corp.,*

902 F.Supp. 1444 (D.Utah 1995) ("reverence portion" at outset of council meetings); *Marsa v. Wernik,* 86 N.J. 232, 430 A.2d 888 (1981) (prayer at outset of borough council meetings); *Colo v. Treasurer and Receiver Gen.,* 378 Mass. 550, 392 N.E.2d 1195 (1979) (salaries for legislative chaplains).

On the other hand, *Marsh* does not support the proposition that government-sponsored prayer at all "deliberative public bodies" is presumptively valid. This phrase is found at the very beginning of the Court's discussion about the history of legislative prayer. The full quotation reads as follows: "The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." 463 U.S. at 786, 103 S.Ct. 3330. But the only public bodies other than legislatures to which the Court specifically refers are the United States courts. More importantly, the Court states only four pages later that "Standing alone, historical patterns cannot justify contemporary violations of constitutional guarantees ..." *Id.* at 790, 103 S.Ct. 3330. Only after making these statements does the Court turn to the specific facts of *Marsh,* and never again makes any mention of "other deliberative public bodies."

### E. Prayers at Cleveland School Board Meetings: *Marsh* or *Lee?*

▇] After finding that the school board was similar to the type of legislative bodies involved in the above-cited cases, the district court concluded that *Marsh* controls. Judge Ryan's dissent, in similar fashion, offers a simple syllogism to decide this case. He would hold that *Marsh's* reference to "other deliberative public bodies" means that all deliberative public bodies may open their meetings with the recitation of a prayer. He then states that because the school board is a deliberative public body, its practice is constitutional. We respectfully disagree. First, as discussed above, it does not appear to us that

*Marsh* created a presumption of validity for government-sponsored prayer at all deliberative public bodies. Second, the question of whether the Cleveland School Board is "a deliberative public body" as that phrase was used in *Marsh* is very much in dispute. The Supreme Court did not define the term, and has never discussed its scope. In fact, as far as *Marsh* is concerned, there are no subsequent Supreme Court cases. *Marsh* is one-of-a-kind, and whether its extension to the Cleveland School Board would conflict with *Lee* and the other school prayer cases is the very issue that makes this case a difficult one.

We thus find ourselves unable to accept Judge Ryan's syllogism, and instead hold that the school board, unlike other public bodies, is an integral part of the public school system. This fact serves to make the unique tradition articulated in *Marsh* inapposite, while it embraces the more "hands-off" tradition observed in the long line of school prayer cases. *See Lee,* 505 U.S. at 596–97, 112 S.Ct. 2649 (noting that inherent differences between the public school system and meetings of the state legislature make the "unique history" in *Marsh* inapplicable); *Allegheny County v. Greater Pittsburgh ACLU,* 492 U.S. 573, 602–03, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (noting that *Marsh* does not stand for the sweeping proposition that all accepted practices with a great lineage are constitutional); *Cammack v. Waihee,* 932 F.2d 765, 772 (9th Cir.1991) ("We are reluctant to extend a ruling explicitly based upon the 'unique history' surrounding legislative prayer ... to such a different factual setting").

In this case, the fact that school board meetings are an integral component of the Cleveland public school system serves to remove it from the logic in *Marsh* and to place it squarely within the history and precedent concerning the school prayer line of cases. That the Cleveland School Board is part of the public school system is underscored by the realities of its meet-

ings. These meetings are conducted on school property by school officials, and are attended by students who actively and regularly participate in the discussions of school-related matters. This reality supports our conclusion that the logic behind the school prayer line of cases is more applicable to the school board's meetings than is the logic behind the legislative-prayer exception in *Marsh.*

The school board contends that its meetings are indistinguishable from the deliberative processes of other public bodies. From the board's point of view, the fact that "the board is an elected body consisting of adults conducting public business in public meetings," *Coles,* 950 F.Supp. at 1346, is both the beginning and the end of the analysis. "The fact that the *subject matter* of board meetings is school-related and that the *location* of board meetings is on school property," *id.* (emphasis in original), is deemed to be of no consequence. We respectfully disagree.

Although the school board, like many other legislative bodies, is composed of publicly elected officials drawn from the local community, that is where the similarity ends. What actually occurs at the school board's meetings is what sets it apart from the deliberative processes of other legislative bodies. Simply stated, the fact that the function of the school board is uniquely directed toward school-related matters gives it a different type of "constituency" than those of other legislative bodies—namely, students. Unlike ordinary constituencies, students cannot vote. They are thus unable to express their discomfort with state-sponsored religious practices through the democratic process. Lacking a voice in the electoral process, students have a heightened interest in expressing their views about the school system through their participation in school board meetings.

The very fact that school board meetings focus solely on school-related matters provides students with an incentive to attend the meetings that is lacking in other

settings. The board makes policy on a wide range of issues directly affecting a student's life in school. Be it dress codes, locker searches, changes in the curriculum, or funding for extracurricular activities, school board meetings are the arena in which all issues directly relevant to students are discussed and decided. The fact that the board regularly presents honors and awards to students at its meetings only provides added enticements for students to attend school board meetings. Furthermore, students who wish to challenge their suspension or expulsion from school are required by statute to air their grievances at a school board meeting. For such students, attendance at a board meeting is not a matter of choice, but a matter of necessity.

The district court, however, was of the view that even if students attend school board meetings, the manner in which such meetings are conducted sets them apart from other student-attended events. "This atmosphere is not the same atmosphere as a classroom or a graduation ceremony, which are fundamentally student functions meriting the particular Establishment Clause protections afforded to youths in Supreme Court jurisprudence." *Coles*, 950 F.Supp. at 1345. The district court perceived the deliberative process at school board meetings as one basically between adults. This perception, however, is not in accord with what actually takes place at meetings of the school board.

First, unlike officials of other legislative bodies, school board members are directly communicating, at least in part, to students. They are setting policies and standards for the education of children within the public school system, a system designed to foster democratic values in the nation's youth, not to exacerbate and amplify differences between them. Allowing the board to act in a manner inconsistent with its fundamental function of running the school system only leads to its further erosion in the minds of those students who either attend or hear about such meetings.

Second, the district court's analysis misapprehends the unique role that students play at school board meetings. Whether it be questioning the board on the efficacy of its programs, receiving awards for their accomplishments, or sitting with the board and delivering reports relating a student's perspective on the operation of the school system, students actively engage school board members in substantive discussions. Meetings of the board serve as a forum for students to petition school officials on issues affecting their education. Simply put, students do not sit idly by as the board discusses various school-related issues. School board meetings are therefore not the equivalent of galleries in a legislature where spectators are incidental to the work of the public body; students are directly involved in the discussion and debate at school board meetings.

We also disagree with the district court's assessment that "[u]nder any other analysis, a challenge could be made to prayer in state legislatures because student pages are present and many classes take field trips to legislative sessions." *Coles*, 950 F.Supp. at 1346. The incidental presence of minors is irrelevant to the history that supports government-sponsored prayer at meetings of the state legislature. Rather, the tradition supporting legislative prayer is keyed to its particular historical setting, a historical setting not present in the context of a school board.

Similarly, the heightened review given to school-sponsored prayer does not turn on any particular children-to-adults ratio, above which prayers are prohibited, but below which they are constitutionally permissible. The district court believed otherwise, noting that "[t]he presence of a small number of students" at school board meetings served to make the school prayer cases inapplicable. *Id.* If such were the case, then many school-related events, such as graduation ceremonies or school sporting events, would be subject to lesser scrutiny simply because of the large presence of adults at such events. Such rea-

soning runs counter to Supreme Court precedent. *See Lee* (striking down school-sponsored prayer at graduation ceremonies); *see also Doe v. Duncanville Indep. Sch. Dist.,* 70 F.3d 402 (5th Cir.1995) (declaring a school's practice of permitting its basketball coach to initiate prayers at the beginning of games unconstitutional under the school prayer line of cases); *Jager v. Douglas County Sch. Dist.,* 862 F.2d 824 (11th Cir.1989) (applying the school prayer cases to prohibit the practice of having an opening prayer at the beginning of high school football games).

Finally, the school-board setting is arguably more coercive to participating students than the graduation ceremony at issue in *Lee.* A school graduation marks, by definition, the end of a student's association with a school. If ever the coercive pressures on a student were to abate, it would be at a celebration marking the end of the school's dominion over this very student. Furthermore, graduation exercises, although important, are not in any way essential to the granting of a diploma. They are purely ceremonial, and one's failure to attend cannot impact the fact of graduation.

In the school board setting, on the other hand, students are a far more captive audience. Although it is obviously true that relatively few students are required to attend a school board meeting, appearance before the board is more compulsory than are graduation exercises for some of them. Students wishing to challenge disciplinary action must appear before the board, and at least one student actually sits on the board to provide a student's perspective on the issues before it. For these students, school board meetings are far more coercive than graduation exercises. In *Lee,* the students were celebrating the end of their association with the school, while here the students might well be fighting to maintain it. This is to say nothing of students who would simply like to have a say in their education by commenting on or otherwise influencing school policy.

To the extent that one sees this as a close case that could go either way, we find it wiser to err on the side of *Lee* and the long line of Establishment Clause jurisprudence that separates church and state in the context of the public school system, than to err on the side of *Marsh,* which itself is basically a historical aberration. Our conclusion is buttressed by the fact that the principles requiring a wall of separation between religion and the public schools (*see* Section **IV. B.,** above) are clearly implicated by the facts of this case.

Given that the school board is an integral part of the public school system, we hold that its practice of opening its meetings with a prayer does not fit within the rubric of *Marsh.* Instead, it must be analyzed pursuant to the test normally used to analyze governmental practices challenged under the Establishment Clause, *i.e.,* the *Lemon* test. *See Dayton Area Visually Impaired Persons v. Fisher,* 70 F.3d 1474, 1482–83 (6th Cir.1995) (applying the *Lemon* test to a state statute that exempted religious organizations from the requirements of the state's charitable solicitation law).

Despite the dissent's suggestion to the contrary, this holding does not create a new constitutional category called the "public school context." Instead, we find that the policy of the Cleveland School Board is so inextricably intertwined with the public schools that it must be evaluated on the same basis as the schools themselves.

## F. The Lemon Test

In *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court articulated a three-part test to decide if a government-sponsored activity offends the Establishment Clause. Under *Lemon,* a government-sponsored activity will not violate the Establishment Clause if: (1) it has a secular purpose, (2) its principal or primary effect neither advances nor inhibits religion, and

(3) it does not create an excessive entanglement of the government with religion. *Lemon*, 403 U.S. at 612–13, 91 S.Ct. 2105. If the challenged practice fails any part of the three-part test, then it violates the Establishment Clause. *See Stone v. Graham*, 449 U.S. 39, 40–41, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980).

### 1. Secular Purpose

█ In considering the purpose prong of the *Lemon* test, the focus of the inquiry is on the intentions of the government. Namely, did "the government intend [ ] to convey a message of endorsement or disapproval of religion," *Edwards v. Aguillard*, 482 U.S. 578, 585, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987), when it implemented the challenged policy. Courts should generally be deferential to the government's articulation of a secular purpose. *See Edwards*, 482 U.S. at 586, 107 S.Ct. 2573. The government's stated secular purpose, however, must be sincere and not a mere sham. *See id.* Although the government's purpose need not be exclusively secular, *Lynch*, 465 U.S. at 681 n. 6, 104 S.Ct. 1355, a practice will violate the Establishment Clause if it is "entirely motivated by a purpose to advance religion." *Wallace v. Jaffree*, 472 U.S. 38, 56, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).

In the present case, the school board argues that it adopted the practice of opening its meetings with an invocation in order to give the meetings a more professional decorum than had existed in the past. The statements of the board's own members, however, contradict this stated secular purpose. Board president Lumpkin's statements that the prayers were an acknowledgment of "Christians who participate in the schools" and that "I feel that the moment that you kick prayer out of the school, the Lord walks out of the school," cast serious doubt on the sincerity of the school board's articulated secular purpose.

Moreover, the content of the prayers delivered at the school board meetings clearly went beyond what was necessary to solemnize or bring a more businesslike decorum to such meetings. The prayers frequently called for divine assistance or affirmation, sometimes by using veiled references to the Bible. In addition, many prayers mentioned Jesus by name. The board could have used the inspirational words of Abraham Lincoln or, as in fact one speaker did, the speeches of Dr. Martin Luther King, Jr. to achieve the same ends. Instead, the board relied upon the intrinsically religious practice of prayer to achieve its stated secular end. ' " The unmistakable message of the Supreme Court's teachings is that the state cannot employ a religious means to serve otherwise legitimate secular interests.' " *Jager v. Douglas County Sch. Dist.*, 862 F.2d 824, 830 (11th Cir.1989) (quoting *Karen B. v. Treen*, 653 F.2d 897, 901 (5th Cir.1981)).

Because there are serious questions as to the true motivation behind the school board's practice, and because such a solemnization for board meetings could have been achieved without resort to prayer, we hold that the school board's practice fails to satisfy the purpose prong of the *Lemon* test.

### 2. Primary Effect

Turning next to the second prong of the *Lemon* test, we find that the practice of opening each school board meeting with a prayer has the primary effect of endorsing religion. "The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval" of religion. *Wallace*, 472 U.S. at 56 n. 42, 105 S.Ct. 2479 (quoting *Lynch*, 465 U.S. at 690, 104 S.Ct. 1355 (O'Connor, J., concurring)). "We must determine whether, under the totality of the circumstances, the challenged practice conveys a message favoring or disfavoring religion." *ACLU v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1486 (3d Cir.1996). "If a reasonable observer would conclude that the message communicated is one of

either endorsement or disapproval of religion, then the challenged practice is unlawful." *Chaudhuri v. Tennessee*, 130 F.3d 232, 237 (6th Cir.1997) (holding that the particular nonsectarian prayer given at a public university's graduation ceremony did not violate the Establishment Clause).

While *Chaudhuri* sustained the constitutionality of the prayer at issue, it did so on the basis that (1) the particular prayer offered was nonsectarian, (2) the university exercised no control over its content, other than to specifically request that the independent giver of the prayer *not* make reference to Jesus Christ, and (3) the setting was a college graduation of adults rather than a school function involving minors. *See* 130 F.3d at 238–39. In contrast, the prayers in this case were clearly sectarian, with repeated references to Jesus and the Bible, the current school board president is himself a Christian minister who personally delivers the majority of the prayers, and the setting is the public body that constantly interacts with elementary and secondary school children. Under these circumstances, any reasonable observer would conclude that the school board was endorsing Christianity. The case before us is thus much closer on its facts to *Lee* than to *Chaudhuri*. The school board's practice of beginning its meetings with a government-sponsored prayer therefore fails the second prong of the *Lemon* test.

### 3. *Entanglement*

■ Finally, addressing the last prong of the *Lemon* test, the challenged practice must avoid excessive entanglement of government with religion. *See Lemon*, 403 U.S. at 613, 91 S.Ct. 2105. "[T]o assess entanglement, we have looked to 'the character and purpose of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority.'" *Agostini v. Felton*, 521 U.S. 203, 232–33, 117 S.Ct. 1997, 2015, 138 L.Ed.2d 391 (1997) (quoting *Lemon*, 403

U.S. at 615, 91 S.Ct. 2105). Not all interaction between the government and religious authority, however, runs afoul of the Establishment Clause. "Interaction between church and state is inevitable, and we have always tolerated some level of involvement between the two." *Agostini*, 117 S.Ct. at 2015 (internal citations omitted). The question before us is whether the school board's practice, insofar as the use of prayer is concerned, involves an excessive entanglement of government in religious matters.

"In *Lee*, the principal decided [that] prayer would be included in the [graduation] ceremony, chose the clergy person who would give the prayer, and even determined part of the content of the prayer by giving the invited clergy guidelines for the substance of the prayer." *ACLU v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1479 (3d Cir.1996) (en banc). As the Court noted in *Lee*, these features of the resulting prayer bear "the imprint of the State." *Lee*, 505 U.S. at 590, 112 S.Ct. 2649.

We find the "excessive entanglement" in this case indistinguishable from the situation in *Lee*. The school board decided to include prayer in its public meetings, chose which member from the local religious community would give those prayers, and has more recently had the school board president himself compose and deliver prayers to those in the audience. In sum, the school board's practice of opening its meetings with prayer leads to excessive entanglement in religious matters and thus fails this final prong of the *Lemon* test.

### V. CONCLUSION

■ Although we conclude that the school board's practice in this case violates the Establishment Clause, we do not mean to imply that religion must be kept entirely out of the public school system. Certainly students might themselves wish to pray during the time they spend at school. It is only when the government, through its school officials, chooses to introduce

and exhort religion in the school system that Establishment Clause concerns take shape. That is what has happened in the present case, with the school board's involvement in promoting prayer crossing the line of constitutional infirmity.

Because the school board's practice in this case conveys the message of government endorsement of religion in the public school system, we **REVERSE** the judgment entered in favor of the school board and **REMAND** the case for entry of judgment in favor of the plaintiffs, and for such further proceedings as may be necessary.

RYAN, Circuit Judge, dissenting.

The majority opinion reverses the judgment of the district court and holds that the Cleveland Board of Education's practice of opening each of its regular business meetings with a prayer violates the Establishment Clause of the First Amendment of the United States Constitution. In my judgment the majority opinion is plainly mistaken.

In a carefully written, closely reasoned, and constitutionally solid analysis the district judge, the Honorable David D. Dowd, Jr., got it precisely right. It would be difficult to improve upon Judge Dowd's excellent opinion, and I am satisfied therefore to align myself with it fully and to adopt his opinion as though it were my own. But it is from the majority opinion in this court that I dissent, and, therefore, there are some additional things to be said.

This is not a complicated case; important, to be sure, but not complicated.

As Judge Dowd and my colleagues correctly observed, the Supreme Court has not spoken on the question before us today. But it has spoken about the constitutionality of prayers in other public bodies, and some of these cases, as the majority opinion recognizes, provide helpful guidance.

It is firmly settled that the state may not proscribe or endorse prayers in a pub-

lic school classroom. *See Wallace v. Jaffree,* 472 U.S. 38, 61, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). And that prohibition has been extended to public high school graduation ceremonies, primarily on the theory that such assemblies are essentially an extension of the classroom environment, and that the same compelling reasons that proscribe prayers in the classroom, proscribe them at high school graduation ceremonies as well. *See Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992).

It is equally well settled that there is no constitutional impediment to prayers offered at the opening of a state legislative assembly. *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). *Marsh* is, in part at least, a recognition that the Supreme Court's longstanding hostility to any religious expression in any government-sponsored assembly must yield to the deep-seated tradition in this country of prayer recitation at the opening sessions of Congress, many state legislatures, and, in modified form, every federal courtroom in the land including the Supreme Court. But what if there had been a longstanding history in this country of prayer being recited to open the school day in public school classrooms? Would logic suggest that the "historic tradition" reasoning of *Marsh* be applied to permit prayers in public school classrooms? Certainly it would not, because there is a principle that distinguishes the effect of public school classroom prayers from prayers recited in legislative assemblies and in federal courtrooms. And that principle is that elementary- and secondary-level students are captive, impressionable, and easily coerced children required by state law to be in the classroom, primarily for the purpose of education and indoctrination. Government-sponsored or even government-tolerated prayer in that environment is very easily seen as having a likely, even if unintended, coercive and indoctrinating effect.

Prayer offered in a legislative assembly—federal, state, or even municipal for that matter—presents none of the "dangers" the Supreme Court sees in classroom prayers.

My colleagues recognize and acknowledge that distinction of course, and seeing it, they struggle mightily to convert the regular business meetings of the Cleveland Board of Education into the functional equivalent of a public elementary or secondary school classroom. The effort fails.

In order to equate the Board of Education's business meetings with a public school classroom, the majority opinion invents the notion that the Supreme Court cases proscribing prayers in the classroom, or at a graduation exercise, really do not mean what they say; but rather, really mean that the prayer is proscribed in every "school setting" or "public school context." Presumably that would include a teacher's conference in the evening or during a weekend, a training session for school administrators, a PTA supper in the school gym, or any other activity conducted on school property, including, of course, a board of education meeting. My colleagues offer no explanation as to what a "school setting" is or a "public school context" is, and cite no authority from the Supreme Court for prohibiting prayer in such "settings," because there is none. Certainly it is true that the earliest Supreme Court cases proscribing prayer in public school classrooms relied heavily on the Justices' insistence that the Establishment Clause creates a "separation between church and state," and the Justices' concern about the "machinery" of the state "advancing religion" in any public forum including a public school classroom. But the Supreme Court itself, apparently recognizing that that rationale does not withstand close scrutiny given the practice in this country of "the machinery of government" permitting and even prescribing prayers at the opening sessions of Congress, state legislative assemblies, and federal courts, has in its later cases sensibly emphasized that it is the coercive, indoctrinating effect of classroom prayers upon impressionable children that is the real basis for prohibiting them. *See, e.g., Lee,* 505 U.S. at 592, 112 S.Ct. 2649; *Edwards v. Aguillard,* 482 U.S. 578, 584, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).

So the question that suggests itself is whether the "dangers" the Supreme Court sees in classroom prayers apply with equal force to prayers offered at the beginning of a board of education meeting. To ask the question is to answer it. It is perfectly plain to me that the public meetings of the Cleveland Board of Education are light years away from a classroom full of elementary or secondary school students. The Cleveland Board of Education is a statutory body of citizens elected by the people of Cleveland for the purpose of administering the Cleveland public school system. It is an administrative/legislative unit of government that has the power of taxation and eminent domain, and it is mandated by statute to conduct the business affairs of the Cleveland Public Schools. These affairs include buying and selling real estate, constructing buildings, establishing educational policy, hiring and firing administrators and teachers, negotiating with labor unions, and occasionally conducting ceremonies honoring student achievement. Even if there were no *Marsh* decision and, therefore, no Supreme Court guidance on the matter of the constitutionality of prayer in public law and policy-making assemblies, my colleagues' attempt to make the meetings of the Cleveland Board of Education equate with the regular educational environment of a primary or secondary public school classroom would be totally unconvincing. But *Marsh* is on the books, and this court is not free to simply disagree with its pronouncement that there is no constitutional obstacle to "opening ... sessions of legislative *and other deliberative public bodies* with prayer." *Marsh,* 463 U.S. at 786, 103 S.Ct. 3330 (emphasis added).

Obviously, the Cleveland Board of Education's business meetings are meetings of a "deliberative public bod[y]." They do not become less so because they are conducted on real estate owned by the school board, and that is so whether the meetings are held in the school district administrative building in downtown Cleveland or, from time-to-time for the convenience of the public, in public school classroom buildings. Wherever it conducts its business, the Cleveland Board of Education is indisputably a "deliberative public bod[y]." The syllogism derived from *Marsh* goes like this:

> There is no constitutional bar to "opening . . . sessions of legislative and other deliberative public bodies with prayer." But the Cleveland Board of Education is a "deliberative public bod[y]."
>
> Therefore, there is no constitutional bar to "opening . . . sessions of [the Cleveland Board of Education] with prayer."

Apparently not entirely comfortable with its argument that prayer is proscribed at the Board of Education meetings simply because the meetings occur in a "school setting" or in a "public school context," the majority opinion shifts its reasoning slightly to embrace the plaintiff's argument that because children are sometimes present at the Board of Education meetings, prayer, *for that reason,* should be forbidden. The problem with that tack is that just as the spectators—children included—in the galleries of our national House and Senate, and in our states' 50 legislatures may come and go freely as they please while the business of the public body is being conducted, so too may they choose to attend or not attend meetings of the Cleveland Board of Education, and if they do attend, come and go as they wish. Stated differently, no amount of federal judicial opposition to the principle of prayer being recited in government assemblies can logically make the reason for proscribing prayers in public school classrooms fit the context of meetings of an elected public school board.

The majority also misplaces emphasis on the location of the meeting. None of the case law prohibiting prayer in public schools has focused on the titleholder to the real estate. Instead, the focus has been on the coerciveness of the situation and on the nature of the business being conducted. Prayer is prohibited when the business being conducted is the education of our youth. Surely a teacher could not lead his students in prayer during a field trip to the zoo simply because the class was no longer on school property. Similarly, the congregation of a church holding its services in a public school building would be permitted to pray even though it is located on school grounds.

In an effort to minimize the importance of coerciveness in the Supreme Court's school prayer doctrine, the majority claims that high school graduation ceremonies are purely voluntary, indicating that coerciveness was not important to the Court's decision in *Lee.* However, the Supreme Court specifically rejected that notion:

> Petitioners and the United States, as *amicus,* made this a center point of the case, arguing that the option of not attending the graduation excuses any inducement or coercion in the ceremony itself. The argument lacks all persuasion. Law reaches past formalism. And to say a teenage student has a real choice not to attend her high school graduation is formalistic in the extreme. True, Deborah could elect not to attend commencement without renouncing her diploma; but we shall not allow the case to turn on this point. Everyone knows that in our society and in our culture high school graduation is one of life's most significant occasions. A school rule which excuses attendance is beside the point. Attendance may not be required by official decree, yet it is apparent that a student is not free to absent herself from the graduation exercise in any real sense of the term "voluntary," for absence would require forfeiture of those intangible benefits which have motivated the student through youth and all her high school years.

*Lee*, 505 U.S. at 594–95, 112 S.Ct. 2649. As I understand the Supreme Court's decisions in this area, coerciveness is clearly central to its decisions.

Finally, I find it unnecessary to consider the three-factor test announced by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105 (1971), relied on by the majority to invalidate the prayer practice before us today. In *Marsh*, the case most closely analogous to this case, the Supreme Court acknowledged the existence of the *Lemon* test, but did not apply it. *See Marsh*, 463 U.S. at 786, 103 S.Ct. 3330. Instead, the Court concluded that because the practice of beginning legislative sessions and "other deliberative public bodies" with a prayer is one that existed at the time the First Amendment was drafted, it cannot possibly be the kind of religious practice that the Establishment Clause was designed to guard against. *See id.* at 786–88, 103 S.Ct. 3330. Far be it for me to run ahead of the United States Supreme Court. If that Court is satisfied that the *Lemon* factors did not apply to prayer before a legislative or "other deliberative public bod[y]," I am satisfied they do not apply to the deliberations of the Cleveland Board of Education.

I would affirm the district court's judgment.